**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SPECIALTY EARTH SCIENCES, LLC, )<br><br>**Plaintiff,** )<br>v. )<br><br>CARUS CORPORATION, )<br><br>**Defendant.** ) | Case No. 15-cv-06133<br><br>Judge: Andrea R. Wood |

**AMENDED DEFENDANT CARUS CORPORATION'S MOTION TO STRIKE EXPERT**
**REPORT AND TESTIMONY BY PLAINTIFF'S EXPERT DR. STEPHANIE A. LUSTER-**
**TEASLEY AND OPINIONS OF JOHN BONE BASED ON LUSTER-TEASLEY'S OPINIONS**

Now Comes Defendant, Carus Corporation (d/b/a/ Carus LCC since July of 2019 when Carus Corporation ceased to exist) (hereinafter referred to as "Carus"), by and through its attorneys, SmithAmundsen LLC, and respectfully moves this Honorable Court to strike all opinions of Plaintiffs' expert Dr. Stephanie A. Luster-Teasley and certain opinions of Plaintiff's expert John Bone that are based on Luster-Teasley's ill-founded conclusions. In support of this Motion, Carus states as follows:

## I.    INTRODUCTION AND STATEMENT OF FACTS

This matter derives from disputes over a license agreement entered into by Plaintiff and Carus. *See* First Amended Complaint, Dkt #207. Plaintiff tendered Dr. Stephanie A. Luster-Teasley ("Luster-Teasley") and John R. Bone, CPA, CFF ("Bone") as its expert witnesses. Luster-Teasley submitted an "Expert Report of Dr. Stephanie A. Luster-Teasley" ("Luster-Teasley Expert Report") dated March 21, 2019 (Ex. A), and a "Rebuttal Report of Dr. Stephanie A. Luster-Teasley" ("Luster-Teasley Rebuttal Report") dated June 20, 2019 (Ex. B). Luster-Teasley was deposed on September 19, 2019. Bone submitted an Expert Report of John R. Bone, CPA, CFF ("Bone Expert Report") dated March 21, 2019 (Ex. C), and a "Rebuttal Report of John R. Bone, CPA, CFF" ("Bone Rebuttal Report") dated June 20, 2019 (Ex. D).

All proffered expert testimony, be it specific, technical or specialized in nature, must be from (1) a qualified expert; (2) the product of a reliable methodology; and (3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). The second prong of this test is intended to test the reliability of the testimony and the third prong is intended to test the relevance of the testimony. *Id.* When reviewed under this framework, Luster-Teasley does not satisfy any of these prongs. She is not a qualified expert in the field as she an academic with no experience in this highly specialized area. She employs ***no methodology*** as she was merely given documents by the Plaintiff's counsel and parrots statements from those documents. Finally, her testimony does not assist the trier of fact any as all she does is read from those documents.

Luster-Teasley is an environmental engineering professor who offers opinions far beyond her qualifications such as product development, commercialization and sales forecasting. This putative expert, who has proffered opinions about turning the technology into a paying commercial product, has had a grand total of one (1) experience in her lifetime related to commercializing licensed technology. In that instance she was the inventor of a patentable idea but admits that she was not responsible for developing the market for it.

Rather than employing any sort of analysis or reasoned methodology, Luster-Teasley offers the stunning prognostication that the entirely unproven technology involved in this case (SOCOR technology) should have produced no less than $10 to $18 million dollars in sales annually within five (5) years from the signing of the license agreement. That speculation is at the core of plaintiff's effort to calculate the eight figure damages claimed in this case. Luster-Teasley's speculative opinion is based almost entirely on internal sales forecasts made by Carus, which forecasts were made (i) without any pre-existing SOCOR sales experience, (ii) while the technology was simultaneously being laboratory tested, and (iii) when the product had not been

manufactured in any scalable amount or been successfully field trialed anywhere in the world. Luster-Teasley's opinions do not qualify as expert opinions and should be excluded.

A.      **Facts Regarding Luster-Teasley Background, Training and/or Experience**

Luster-Teasley has never testified in any cases or been qualified to offer expert opinions pursuant to Federal Rule of Evidence 702. Ex. E, Luster-Teasley Dep at 8:9-13, 24:8-23. She was retained for the first time as an expert witness in this case. *Id.* Luster-Teasley's work as an environmental engineer consists of less than two years of experience during and immediately following her education. She specialized in ozone as a chemical oxidant, the subject of her doctoral dissertation. *Id.* at 58:19-20. She worked for about 8 months in 2003 as a junior engineer for ARCADIS G&M, LLC, a small environmental engineering firm in Southfield Michigan, right after defending her dissertation. *Id.* at 56:5-57:4. Her experience in soil and groundwater remediation at ARCADIS was limited to "reading, understanding chemistry," and helping the senior engineer understand chemical oxidation. *Id.* at 59:2-21. Luster-Teasley never visited any site involving groundwater or soil treatment. *Id.* at 60:14-22. Subsequently, she worked as a field engineer at Malcolm Pirnie for less than one year. *Id.* at 61:14-62:1, 63:19-64:4. There, her remediation work was limited to oversight of the remediation of coal ash at one abandoned site to ensure senior engineers' designs were properly implemented. *Id.* at 65:21-66:6. While at ARCADIS and Malcom Pirnie, Luster-Teasley did not help commercialize any products or remediation technology. *Id.* at 66:20-67:9, 297:19-20.

Luster-Teasley started teaching at North Carolina A&T State University in 2004 and has been in academia ever since. *Id.* at 64:1-11. She has summed up her own purported expertise as "an academic who has training in chemical oxidation." *Id.* at 294:19-24. She does not know how many controlled release products are available in the market place and/or how many companies are currently in related industries. *Id.* at 251:15-252:18. She has barely any commercialization

experience either in academic or non-academic settings. *Id.* at 66:21 – 67:4, 67:10 – 68:8, 78:24-79:8, 82:24-83:23. She has no degrees or experience in advertising and has never worked in an advertising or marketing role. *Id.* at 299:14-8. She has no experience in commercialization of any product including the technology she herself invented. Luster-Teasley admitted that "AxNano licensed my technology and they lead (sic) commercialization." *Id.* at 79:3-8. When asked if she has done research on commercialization in an academic setting, she testified that her knowledge is limited to the "university [bringing] in people to talk to the academics about their products so that we could understand moving forward to commercialization." *Id.* at 84:6-11. When asked how many training sessions she attended on commercialization, Luster-Teasley testified that there were "at least two or three [sessions] over the course of [her] career as an academic before [her] technology was licensed." *Id.* at 84:17-21. In the "Qualifications" section of her expert report, Luster-Teasley merely states that she has "develop[ed] the technology for commercialization, research and development, and field deployment," but offers no specific experience or training in commercialization itself. Ex. A, Luster-Teasley Expert Report, pg. 2, Section A.

Luster-Teasley was not familiar with Carus prior to her involvement in this case. She never spoke with any Carus personnel. *Id.* at 27:12-17. She never visited Carus' corporate offices and/or any of the sites where Carus' products or technology were utilized. Luster-Teasley never investigated the market for the SOCOR technology by interviewing any prospective customers, attempting to verify what part of the remediation market might be suited to the SOCOR remediation product, or its price, prevailing use or availability of alternative products or suppliers that might be used in lieu of the licensed technology. Instead, as support for her opinions she relied almost exclusively on the documents that were hand-picked by Plaintiff's Counsel and provided to her. *Id.* at 36:7-42:20. As a whole, Luster-Teasley testimony shows that

she has no education, vocational background or training in (1) identifying customers and/or marketing to likely users of the product; (2) promotional activities in the remediation industry; (3) field testing the technology to demonstrate safety and efficacy; (4) manufacturing processes for chemical oxidants compatible with the technology; (5) product development strategies for the chemical oxidation market; or (6) any other of the skills and abilities required to turn the technology into a stream of income from SOCOR product sales.

Ms. Luster-Teasley has no qualification to offer any opinions about what the commercialization of this novel and untested technology might or could produce as a revenue stream within any specific amount of time. She has no basis to testify about the scope of "licensed products" as defined by the license agreement (an issue of contract interpretation for the Court to decide). Luster-Teasley cannot testify about what the term "commercially reasonable efforts" requires in the context of this license agreement (which required both parties to mutually collaborate to develop a market for a new unproven idea). Moreover, her experience teaching environmental engineering does not qualify her to testify regarding any of Carus' actions or inactions with respect to product development, commercialization, or sales. It does not give her a crystal ball to predict that sales of this unproven idea should be no less than $10 to $18 million dollars of sales annually within 5 years of signing the license agreement.

**Relevant Facts Regarding Bone**

Bone is a Managing Director at Stout Risius Ross, LLC, a financial advisory services firm, and was retained to "analyze the harm to SE Sciences as a result of the alleged actions by Carus Corporation." Bone Expert Report at p. 1. Bone offers opinions relating to three categories of damages, the second of which is damages suffered by SE Sciences resulting from Carus' alleged failure to use commercially reasonable efforts to commercialize the SOCOR product. *Id.* at p. 4. Bone does not, however, have any professional training, education, or

background with respect to marketing or sales of the types of products at issue in this case, namely products that treat or attempt to remediate contaminated groundwater or soil. Ex. F, Bone Dep at 18:2-15. In preparing his second category of opinions, he did not independently research the relevant market. Ex. F, Bone Dep. Instead, he relied on Luster-Teasley's "understanding of the overall market and the ability of Carus to have made the sales that were in their forecasts." *Id.* at 21:17-21. Therefore, because Luster-Teasley's opinions are unreliable and unhelpful to the trier of fact, Bone's opinions based only on Luster-Teasley's work should be excluded.

## II.     ARGUMENT

### A.     Legal Standard.

The admission of expert testimony is governed by Federal Rule of Evidence ("FRE") 702 and the principles laid out in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). FRE 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)     the testimony is based upon sufficient facts or data;
> (c)     the testimony is the product of reliable principles and methods; and
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

The "district court must function as a 'gatekeeper' to ensure that the offered expert testimony is both relevant and reliable." *Korte v. Exxonmobile Coal USA, Inc.,* 164 Fed. Appx. 553, 556 (7th Cir. 2006) (citing *Daubert*, 509 U.S. at 589).

Notably, an expert for one purpose is not an expert for all purposes. "Even where a witness has special knowledge or experience, qualification to testify as an expert also requires that the area of the witness's competence matches the subject matter of the witness's testimony."

See 29 Charles A. Wright. et al., Federal Practice & Procedure § 6265 at p. 255 & nn. 34 & 35 (1977). Accordingly, not all opinions that happen to be held by an expert are "expert opinions." See United States v. Benson, 941 F.2d 598, 604 (7th Cir. 1991) (rejecting "expert" testimony that consisted "of nothing more than drawing inferences from the evidence that he was no more qualified than the jury to draw"). Moreover, even assuming that a proposed expert witness is in fact "qualified as an expert by knowledge, skill, experience, training or education" in the area at issue, the proponent of expert testimony still bears the burden of showing by a preponderance of the evidence that the proposed testimony is reliable. Daubert, 509 U.S. at 588.

**B.** **Luster-Teasley's Opinions Should Be Excluded In Their Entirety**

**1. Luster-Teasley Is Not Qualified To Provide Expert Testimony on Her Proffered Opinions**

"An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." United States v. Benson, 941 F.2d at 604. Luster-Teasley lacks the knowledge, skill, experience, training, or education to assist the trier of fact to understand the evidence or to determine any facts at issue in this case. Because Luster-Teasley is not qualified to testify as an expert, her expert report and opinions should be excluded. She works in academia studying the technological aspects of chemical oxidation, not the development or commercialization of remediation products or technologies.

In Sections D through F of her Expert Report, Luster-Teasley opines as to whether Carus used "commercially reasonable" efforts to develop the market for the Licensed Products within the meaning of the License Agreement, and also opines about how much product Carus should have been able to sell. However, she has no experience that would qualify her as an expert with

respect to product development, commercialization, sales or marketing. Her work experience at engineering firms did not include producing or commercializing any products. Ex. E, Luster-Teasley Dep at 66:21 – 67:4 and 67:10 – 68:8. While Luster-Teasley did academic research at her University which led to a license agreement in 2017 between North Carolina A&T and a licensee engaged to turn the technology into a commercially viable product, she acknowledges that she was the inventor only, that she had no experience with marketing this patentable idea. Her exposure to marketing or commercialization was limited to attending two or three commercialization training sessions arranged by the University in approximately 2014 or 2015. Ex. E, Luster-Teasley Dep at 83:18-85:16. Regarding her licensed technology, she did not commercialize the product and her involvement in the commercialization of the product was limited to attending meetings as the inventor of the product. Ex. E, Luster-Teasley Dep at 77:19-79:8, 79:9-20 and 82:24-83:5. Further, Luster-Teasley has never personally created sales projections during her career. Ex. E, Luster-Teasley Dep at 274:12-19.

It is well-established that an expert's bare assertion of an unsupported opinion does not constitute a reliable methodology. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." ); *Lee v. Marlowe*, No. 3:08 CV 1739, 2009 WL 2591668, *4 (N.D. Ohio Aug. 20, 2009) (concluding that proffered expert offered nothing more than *ipse dixit* opinions, and noting that "[the proffered expert] lacks any articulable basis for [his conclusions] and his opinion appears to be no more than 'subjective belief or unsupported speculation.'") (citation omitted); *see also Daubert*, 509 U.S. at 590 ("It is not sufficient, however, for the expert's testimony to be based merely upon 'subjective belief or unsupported speculation.'").

In Sections B and C of her Expert Report, Luster-Teasley also purports to interpret the License Agreement entered into by the Parties and offers opinions on what Carus Products are Licensed Products. However, Luster-Teasley is not a technology licensing expert nor is she qualified to interpret the scope of the contract. She has never received any legal training or education relating to interpreting license agreements. Ex. E, Luster-Teasley Dep at 70:23-71:6. Indeed, other than reviewing the license agreement at issue in this case, her experience with license agreements is limited to reading the one license agreement signed in 2017 when the University she works for licensed her product to AxNano, LLC, a company that commercializes academic research technologies. Ex. E, Luster-Teasley Dep at 72:2 –76:15 and 101:8-22. Her input on that license agreement was limited to raising some questions, which resulted in one slight change to the wording of the agreement to ensure she will be able to work with her students to continue the research. Ex. E, Luster-Teasley Dep at 95:3-96:17. Luster-Teasley is clearly not qualified as an expert with respect to the interpretation and scope of license agreements.

In Section A of her Expert Report, Luster-Teasley provides some background information relating to chemical oxidation, and in her Rebuttal Report she offers opinions on the viability and applicability of wax-based oxidant cylinders as a technology. However, Luster-Teasley does not have any first-hand experience with the wax-based oxidant cylinders that are the subject of this dispute. She has done no field testing with such products. Ex. E, Luster-Teasley Dep at 279:20-280:11. And, while she referred to 294,000 government and private sites in the U.S. needing remediation, Rebuttal Report at p. 5, she has admitted that she does not know how many of those sites would be suitable for using wax-based oxidant cylinders. Ex. E, Luster-Teasley Dep at 277:14-278:3. Luster-Teasley does not have any expertise in the use of the types

of products that are at issue, and thus she is not qualified to offer opinions as an expert relating to the applicability or use of such products in the field.

### 2. Luster-Teasley Does Not Employ Reliable Methodology & Her Opinions Lack Foundation

"An expert witness cannot merely present his qualifications alongside his opinion; he must explain why the application of his prior experience to the facts at hand compel his final conclusions." *Crawford Supply Grp., Inc. v. Bank of Am., N.A.*, No. 09-CV-2513, 2011 WL 4840965, at *3 (N.D. Ill. Oct. 12, 2011) (rejecting expert's proposed testimony based on his prior experience because "he never draws explicit connections between specific incidences or lessons from his professional history and the [facts of the case]"); *see also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir.2010) ("The expert must explain the methodologies and principles supporting the opinion").

Further, expert testimony may not be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). In order to be considered reliable under a *Daubert* analysis, "… the proponent of the expert testimony must show by a preponderance of the evidence … that the methodology underlying [the expert's] conclusions is scientifically valid." (*See Marmo v. Tyson, Supra*, 457 F.3d at 757-58 (8th Cir. 2006); *citing Daubert*, 509 U.S. at 589-90.) In order to determine whether a methodology has been reliably applied by an expert, "… the court must be careful to <u>examine the methodology</u>, and <u>not the conclusions</u> drawn from it." (*In re Genetically Modified Rice Litigation*, 666 F.Supp.2d 1004, 1032 (E.D. Mo. 2009) (*citing Daubert*, 509 U.S. at 595) (emphasis added).) "Methodology is reliably applied if the expert completes the required

procedure, the data used is that 'typically' relied upon, and the expert does not fail to account for relevant variables." (*Id.* (internal citations omitted).)

Luster-Teasley's approach to her opinions is identical to the approach that was rejected in *Crawford Supply Grp., Inc. v. Bank of Am., N.A.*, No. 09-CV-2513, 2011 WL 4840965, at \*3 (N.D. Ill. Oct. 12, 2011). In *Crawford*, the court explained that expert testimony on the commercial reasonableness of a party's conduct may be admissible only if it would "assist the jury in determining a material fact" by providing information on industry norms that are not matters of common knowledge. *Id.* at \*2. In barring the expert's opinions as to what was commercially reasonable, *Crawford* Court explained its reasoning:

> In this case, however, Bagnoli's experience-based testimony does not satisfy Daubert's reliability standard because **Bagnoli has not articulated what specific aspects of his banking experience support his conclusions regarding the Bank's conduct**. "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FED.R.EVID. 702 advisory committee's notes. An expert witness cannot merely present his qualifications alongside his opinion; he must explain why the application of his prior experience to the facts at hand compel his final conclusions. *Metavante*, 619 F.3d at 761; *see also Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir.2010) ("The expert must explain the methodologies and principles supporting the opinion."). **Such an explanation is required by Daubert**, in which the Court called on the trial judge to conduct a preliminary assessment of the validity of an expert's reasoning or methodology and his or her application of that reasoning or methodology to the facts at issue. Daubert, 509 U.S. at 592–93. **No such assessment can be conducted, however, where the expert proffers opinion but no analysis**.

> The crux of Bagnoli's testimony is that the Bank acted in a commercially unreasonable manner when it failed to properly identify Rome's conduct as suspicious activity and as meriting thorough investigation. (Bagnoli Report at 24.) Throughout his affidavit and deposition, Bagnoli refers to his general experience as the basis for his opinions, but **he never draws explicit connections between specific incidences or lessons from his professional history and the Bank's conduct here**. For example, after recounting the multiple instances where Rome deposited checks drawn from various Plaintiffs' accounts in his own personal accounts, Bagnoli stated simply, "This type of activity is suspicious on its face and would warrant further investigation under a standard of commercial reasonableness." **Bagnoli did not explain why Rome's conduct should have**

> **raised a red flag: He did not cite industry publications or standards for the identification of suspicious activity. He made no reference to any instances in his decades of banking experience where conduct similar to Rome's prompted an investigation of the scope allegedly required here. He offered no unique insight into banking practices that would justify his conclusion.**

*Id.* at *3 (emphasis added).

Similar to the opinion of the expert in *Crawford*, Luster-Teasley employs no methodology whatsoever in reaching her conclusions. She does not articulate any industry standards or generally accepted practices in the commercialization of chemical remediation products that define the scope of "commercially reasonable" behavior such as the size of the sales force required, the amount of product development expenditures that should be expected or market research that must be accomplished. She provides no independent analysis of the nature of the market for the products at issue, cites no testing regarding the types of applications or sites with which the products may be effective, and identifies no evidence whether they are effective.

Further, this purported expert has not bothered to contact any actual or prospective customers to determine what prevailing chemical remediation products they buy now or might buy if available. She has not investigated the sales history of the same or similar products or how long it has taken to achieve a specific market share or sales volume. She has not interviewed the customers who field trialed the SES SOCOR technology and found it wanting. She has not determined the sales of competitors products or, indeed if there are any competitors at all in the chemical remediation market. In short, Luster-Teasley did no work to provide any information that is outside the understanding of the normal juror and she does not base her opinions upon any foundation other than using documents produced by the Defendant to parrot the arguments made by SES' counsel. Contrary to *Crawford*, Luster-Teasley simply regurgitated documents produced by Carus and then opined that the Carus documents establish that Carus did not meet its obligation under the contract.

With respect to her opinions on product development and commercialization, Luster-Teasley merely makes conclusory statements that Carus did not act reasonably, without employing any methodology to provide a basis for those conclusions. Luster-Teasley repeatedly states that in order to be reasonable, Carus should have acted "aggressively", *see* Luster-Teasley Expert Report at pp. 22, 24, and 26, but she provides no reasoning as to why such behavior was required, nor does she affirmatively state what "aggressive action" was required for Carus to meet the contract's commercially reasonable requirement. Luster-Teasley also glosses over the setbacks and difficulties that occurred during product development, which even caused a change in the nature of the product from microencapsulation to cylinders. Luster-Teasley Expert Report at pp. 23-24. Luster-Teasley states that a two year time period between entering into the License and producing product is unreasonable, but provides no substantiation of what normal product development time periods under the circumstances or whether there is any industry standard.

With respect to projecting sales of purportedly Licensed Products, Luster-Teasley offers opinions based only on her reading of Carus documents, most of which were created prior to lab analysis or field testing of the products. Luster-Teasley fails to provide any independent analysis of the market, any determination of whether Carus' initial projections were accurate, or any discussion of industry norms regarding product development. She provides no adjustment in her analysis for any setback or delay. In a business setting, it is unfounded to assume products must be a commercial success for conduct to have been "reasonable." In short, Luster-Teasley completely fails to reference any aspect of her experience that would support any of her opinions, nor does she offer any specialized knowledge that justifies her conclusions. The absence of any methodology renders Luster-Teasley's testimony inadmissible as unreliable under Federal Rule of Evidence 702. *Daubert*, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation"); *Id.* at 1319 ("experts must explain ***precisely*** how they

went about reaching their conclusions"). As federal courts have made clear, "[a]ssumptions based on conclusory statements of the expert's client [or other witnesses], rather than on the expert's independent evaluation are not reasonable." *CIT Grp. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011); see also *Schoenfeld v. Hilliard*, 218 F.3d 164, 173 (2d Cir. 2000) ("The entrepreneur's cheerful prognostications are not enough" to constitute reliability); *Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 926 (S.D.N.Y. 1985) (excluding expert who relied on client's conclusory statements).

Luster-Teasley's opinions are simply beyond what she is qualified or trained to offer. Although Luster-Teasley is an environmental engineering professor, that does not mean she can testify about what is "commercially reasonable" under the license agreement or how products should be brought to market. "An expert may be generally qualified but may lack qualifications to testify outside his area of expertise." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322-23 (3d Cir. 2003). *Martinez v. Sakurai Graphic Sys. Corp.*, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007) ("Generalized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge."). Therefore, her opinions should be excluded.

### Bone's Second and Third Categories of Opinions Should Be Excluded

#### 3. Bone's Opinions on Damages Based on the Dropped Claim of Tortious Interference Should be Excluded

The third category of damages upon which Bone opines, Bone Expert Report at pp. 4-5 and 25-29, is damages based on tortious interference, a claim that has now been abandoned by the Plaintiff and is not included in the First Amended Complaint. Dkt. #207. Because the claim of tortious interference is no longer at issue in the case, Bone's opinions on that topic have been rendered moot, are no longer relevant, and should be excluded.

### 4. Bone's Opinions on Damages Based on Failure to Use Commercially Reasonable Efforts Should be Excluded

The second category of damages upon which Bone opines, Bone Expert Report at pp. 4 and 18-25, is damages based on Carus' alleged failure to use commercially reasonable efforts, for which Bone presents four alternative scenarios. During his deposition, Bone admitted that all four scenarios are based on Carus' internal projections and discussions with Luster-Teasley. Ex. F, Bone Dep at 136:7-9. Indeed, because Bone does not have experience in the market relevant to the products at issue, Ex. F, Bone Dep at 18:2-15, he relied on the purported "expertise" of Luster-Teasley and her "understanding of the overall market and the ability for Carus to have made the sales that were in their forecasts." Id. at 21:17-21. Moreover, Bone's third and fourth scenarios are solely based on Luster-Teasley's opinion that Carus could have achieved $10 million in annual sales sooner than what was forecasted in the documents. Id. at 166:20-167:3 and 169:7-12. Bone himself admitted that, if Teasley's opinions on sales were to be excluded, his third and fourth scenarios would have to be withdrawn. Id. at 227:15-228:4. Accordingly, because Luster-Teasley does not have the requisite expertise to testify, and did not employ any reliable methodology in forming her opinions about sales, marketing and commercial development, Bone's opinions relying upon Luster-Teasley's opinions are likewise flawed.

### III.   CONCLUSION

WHEREFORE, for the reasons set forth herein, Defendant Carus respectfully requests that this Court issue an Order excluding the testimony and reports of Luster-Teasley Expert in their entirety, and excluding the testimony and reports of Bone that rely upon Luster-Teasley or the withdrawn claim of tortious interference.

SmithAmundsen LLC

By:   s/Glen E. Amundsen
_____
One of the Attorneys for Defendant,
CARUS CORPORATION

Glen E. Amundsen – ARDC# 3126776
Gary Zhao – ARDC# 6279527
Jennifer Lacroix – ARDC#6272578
Joseph P. Carlasare – ARDC# 6308706
SmithAmundsen LLC
150 North Michigan Avenue, Suite 3300
Chicago, Illinois 60601
(312) 894-3200 // (312) 894-3210 (fax)

## CERTIFICATE OF SERVICE

I, **Glen Amundsen**, hereby certify that on this 21st day of February, 2020, I electronically filed the attached Amended Motion with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Patrick L. Patras (6210929)
**CARPENTER LIPPS & LELAND LLP**
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
Tel: (312) 777-4300
Fax: (312) 777-4839
patras@carpenterlipps.com

Mark K. Suri (6199636)
Leigh C. Bonsall (6302440)
**HINSHAW & CULBERTSON LLP**
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606
Tel:  (312) 704-3000
Fax:  (312) 704-3001
msuri@hinshawlaw.com
lbonsall@hinshawlaw.com

By:     /s/ Glen Amundsen
Attorney No.: 3126776
**Attorney for Defendant**
SmithAmundsen LLC
150 N. Michigan Avenue, Suite 3300
Chicago, Illinois 60601
Telephone: (312) 894-3200
Fax (312) 894-3210
E-mail: gzhao@salawus.com

**<u>INDEX OF EXHIBITS TO DEFENDANT CARUS CORPORATION'S
MOTION TO STRIKE EXPERT REPORT AND TESTIMONY BY PLAINTIFF'S
EXPERT DR. STEPHANIE A. LUSTER-TEASLEY AND OPINIONS OF JOHN
BONE BASED ON LUSTER-TEASLEY'S OPINIONS</u>**

| <u>EX</u> | <u>DESCRIPTION</u> |
|---|---|
| Amended A | Expert Report of Dr. Stephanie A. Luster-Teasley dated March 21, 2019 |
| B | Rebuttal Report of Dr. Stephanie A. Luster-Teasley dated June 20, 2019 |
| Amended C | Expert Report of John R. Bone, CPA, CFF dated March 21, 2019 |
| D | Rebuttal Report of John R. Bone, CPA, CFF dated June 20, 2019 |
| E | Deposition Transcript of Dr. Stephanie A. Luster-Teasley dated September 19, 2019 |
| F | Deposition Transcript of John R. Bone, CPA dated October 29, 2019 |

# AMENDED EXHIBIT A

# FILED UNDER SEAL

# EXHIBIT B

# FILED UNDER SEAL

# AMENDED EXHIBIT C

# FILED UNDER SEAL

# EXHIBIT D

# FILED UNDER SEAL

# EXHIBIT E

# FILED UNDER SEAL

# EXHIBIT F

# FILED UNDER SEAL