**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SPECIALTY EARTH SCIENCES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-cv-06133 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CARUS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Specialty Earth Sciences, LLC ("SES") invented an environmental remediation technology and, in late 2008, began looking for an established partner to help commercialize the technology. SES ultimately awarded an exclusive license for its technology to Defendant Carus Corporation ("Carus") for at least three years. Yet SES now alleges that Carus failed in multiple ways to meet its obligations under the parties' licensing agreement and never actually intended to develop a market for SES's technology. SES's five-Count First Amended Complaint in this case asserts claims for breach of contract, breach of fiduciary duty, common law fraud, promissory fraud, and constructive fraud. Before the Court are SES's motion to partially strike the opinions, expert report, and testimony of Carus expert Michelle Crimi and to strike the opinions, expert report, and testimony of Carus's expert George Wheeler (Dkt. No. 250), SES's motion for partial summary judgment (Dkt. No. 244), and Carus's motion for summary judgment on Counts I–V of the First Amended Complaint (Dkt. No. 242). For the reasons that follow, SES's motion to strike is granted, its motion for partial summary judgment is granted in part and denied in part, and Carus's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

### I. Local Rule 56.1

Before summarizing the material facts, the Court must first address the parties' competing accusations of noncompliance with Northern District of Illinois Local Rule 56.1. Local Rule 56.1 requires the party moving for summary judgment to submit a statement of material facts that it contends entitle it to summary judgment. L.R. 56.1(a)(2). The statement of material facts must consist of "concise numbered paragraphs" and "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number that supports it." L.R. 56.1(d)(1), (d)(2). "The court may disregard any asserted fact that is not supported with such a citation." L.R. 56.1(d)(2).

The party opposing summary judgment must then file a response to the statement of material facts. L.R. 56.1(b)(2). The response must consist of numbered paragraphs that correspond to the numbered paragraphs in the statement of material facts and set forth the asserted fact and the opposing party's response to that fact. L.R. 56.1(e)(1). "Each response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." L.R. 56.1(e)(2). Any dispute of an asserted fact must be supported by a citation to "specific evidentiary material that controverts the fact" and a concise explanation of how the cited material controverts the asserted fact. L.R. 56.1(e)(3). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *Id.*

To the extent the opposing party wishes to present any additional facts, it may do so by submitting a separate statement of additional facts that complies with Local Rule 56.1(d), which governs the moving party's statement of material facts. L.R. 56.1(b)(3). Then, the moving party must submit a response to those additional facts subject to the requirements for the opposing

party's response to the statement of material facts set forth by Local Rule 56.1(e). L.R. 56.1(c)(2). No submission under Local Rule 56.1 may contain legal argument except responses may make objections, "including objections based on admissibility, materiality, or absence of evidentiary support." L.R. 56.1(d)(4), (e)(2).

The Seventh Circuit has "repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009). "This is because 'compliance with local rules like Rule 56.1 ensures the facts material to the issues in the case and the evidence supporting such facts are clearly organized and presented for the court's summary judgment determination.'" *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1017 (N.D. Ill. 2018) (alteration omitted) (quoting *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015)). A district court is therefore entitled to "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' statements." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).

Carus makes the first accusation of noncompliance with Local Rule 56.1 in responding to SES's motion for partial summary judgment. In particular, Carus states that it objects to the "form and substance" of many of SES's statements of material fact as "convoluted and argumentative," and it further contends that several asserted facts fail to cite evidence in the record. (Def.'s Resp. to Pl.'s Statement of Material Facts ("DRPSF") at 1 n.1, Dkt. No. 269.) However, the Court finds that Carus overstates its case. First, the Court is unable to identify any significant failure by SES to support its asserted facts with citations to the record nor does Carus cite any specific instance of such a failure. And while certain of SES's statements of fact are improperly argumentative or reflect SES's characterization of the evidence, the Court finds that most of SES's factual

assertions are complaint with Local Rule 56.1. Moreover, Carus properly objects in its response when it believes a particular statement contains "argumentations and characterizations," (*e.g.*, *id.* ¶ 8), and where it agrees, the Court is fully able to disregard the noncompliant portions of the statement. There is no reason to go any further and strike the entirety of SES's statement of material facts just because it contains some instances of argumentation and characterization. *See Rivera*, 319 F. Supp. 3d at 1018 ("The noncompliant paragraphs will not be stricken, however, as doing so would in some cases throw out a properly supported assertion along with a legal argument or conclusion."). In short, SES commits only minor violations of Local Rule 56.1 and its submission still effectively presents the material facts in a clear and organized fashion.

In its reply in support of its motion for summary judgment, Carus doubled down on its accusations of noncompliance, directing them toward SES's statement of additional facts in opposition to Carus's motion for summary judgment. Carus contended that that most of SES's numbered paragraphs consist of "attorney characterization and argument" and "the vast majority of the[] 'facts' are statements taken out of context." (Def.'s Reply in Supp. of Mot. for Summ. J. at 1 n.1, Dkt. No. 280.) Therefore, Carus initially declined altogether to respond to SES's statement of additional facts and instead moved to strike the entire submission. Of course, "[m]otions to strike all or portions of an opposing party's [Rule] 56.1 submission are disfavored." L.R. 56.1(e)(2). Accordingly, the Court denied Carus's request to strike SES's statement of additional facts, finding that the issue was not as egregious as Carus claimed. (Dkt. No. 385.) As with its statement of material facts in support of its motion for summary judgment, SES's statement of additional facts consisted largely of well-supported factual assertions and the Court saw no basis to throw those assertions out based on small violations elsewhere in SES's submission. While the Court had discretion to treat all of SES's factual assertions as admitted,

L.R. 56.1(e)(2), it instead directed Carus to submit a response to the statement of additional facts that complied with Local Rule 56.1.

Notably, even as Carus was requesting that the Court take the drastic action of striking SES's submissions under Local Rule 56.1, Carus was itself committing far more substantial violations of that rule. First, as highlighted by SES, Carus does not submit a statement of additional facts in support of its opposition to SES's motion for partial summary judgment. Rather, it cites directly to the record in its response brief in plain violation of Local Rule 56.1. *Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809 (7th Cir. 2005) ("Local Rule 56.1 ***requires specifically*** that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate statement of any additional facts that require the denial of summary judgment." (internal quotation marks and alteration omitted)); *Mervyn v. Nelson Westerberg, Inc.*, 142 F. Supp. 3d 663, 664 (N.D. Ill. 2015) (collecting cases). "Local Rule 56.1 statements and responses establish the bridge between the record and the parties' arguments, and the value of those statements and responses is largely lost if the parties' briefs ignore them and instead cite the record." *Mervyn*, 142 F. Supp. 3d at 666. By setting forth new facts in its response brief, Carus precluded SES from properly responding to those factual assertions and made the summary judgment process more burdensome, contrary to the purpose of Local Rule 56.1. *See Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012) ("The purpose of [Rule 56.1] is to make the summary judgment process less burdensome on district courts . . . ."). For that reason, the Court will disregard the new facts set forth in Carus's response in opposition to SES's motion for partial summary judgment. *Cichon*, 401 F.3d at 809–10 ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed.").

In addition, Carus's response to SES's statement of material facts also contains several denials that fail to cite specific evidentiary material controverting SES's asserted fact, as required by Local Rule 56.1(e)(3). First, Carus denies several facts relating to meetings involving Matt Dingens, Carus's former Global Marketing Manager for the company's Carus Remediation Technologies division, but provides no specific evidentiary support for its position. Instead, Carus merely states that "Dingens is not available to testify and cannot offer statements to the contrary of those asserted by [SES]." (*E.g.*, DRPSF ¶ 15.) Carus elaborates in its response brief that Dingens is unable to testify due to complications from a stroke he suffered shortly after SES initiated this action. Yet Carus points to no authority suggesting that a party opposing summary judgment is excused from supporting its denial of a material fact with record evidence simply because the witness best situated to provide that evidence is medically unavailable. While Carus makes the unsupported boilerplate contention that there are disputes regarding what happened at the meetings with Dingens, "a mere disagreement with the movant's asserted fact is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Given that Dingens will be unavailable to testify at a potential trial, Carus needed to find some alternative form of evidence to create a factual dispute regarding what occurred at those meetings. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." (internal quotation marks omitted)). Because Carus fails to present such evidence, the Court must conclude that there is no factual dispute as to these meetings for the jury to resolve at trial. For that reason, any denials predicated solely on Dingens's unavailability will be treated as admissions.

Carus also responds to certain of SES's factual statements by stating that the exhibits cited by SES "speak for themselves," and denying SES's statements "to the extent that they are inconsistent with the content of those documents." (*E.g.*, DRPSF ¶ 32.) Yet, Carus makes no effort at explaining how the cited exhibits are inconsistent with SES's factual statements and cites no other evidence controverting SES's factual statement. It was Carus's job to explain why those documents do not support SES's factual assertions, and this Court "is not required to wade through improper denials . . . in search of a genuinely disputed fact." *Smith*, 321 F.3d at 683 (internal quotation marks omitted). As the Seventh Circuit has recognized, "judges are not like pigs, hunting for truffles buried in briefs." *Id.* (internal quotation marks and alteration omitted). The Court therefore disregards these improper denials and instead treats the factual statements to which they are directed as admitted.

## II. Factual Background

Subject to the above Local Rule 56.1 rulings, the following facts are undisputed unless otherwise noted.

SES is an environmental remediation services company founded in 2003 by husband and wife, Jason Swearingen and Lindsay Swearingen (collectively, "Swearingens"). (DRPSF ¶¶ 1, 5; Pl.'s Resp. to Def.'s Statement of Material Facts ("PRDSF") ¶¶ 1, 6, Dkt. No. 270.) It describes itself as specializing in cost-effective and innovative solutions to soil and groundwater remediation issues. (DRPSF ¶ 5.) Along with the Swearingens, SES has ten other employees. (*Id.*) In 2003, SES began working on developing technology relating to encapsulating oxidants and other reactants.[1] (*Id.* ¶ 6.) According to SES, its technology "allows for treatment of soil and groundwater contamination using smaller amounts of reactants, as well as less labor than

---

[1] An oxidant is a chemical compound that gains electrons in a chemical reaction and is a type of reactant. (DRPSF ¶ 6.)

traditional in situ chemical oxidation," and can result in more efficient and cost-effective environmental cleanup.[2] (*Id.* ¶ 7.)

After several years of researching and developing its encapsulated oxidant technology, SES was granted its first patent on October 7, 2008,[3] U.S. Patent No. 7,431,849. (*Id.* ¶¶ 8–9.) Shortly thereafter, SES contacted two companies about commercializing its technology. (DRPSF ¶ 9; PRDSF ¶ 12.) Because SES was a small services company, it believed that, by itself, it lacked the resources to reach the potential markets for its technology such as remediation, wastewater treatment, and municipal water treatment. (DRPSF ¶ 9.) Of the two companies it contacted, only Carus took an interest in SES's technology. (PRDSF ¶ 13.) Carus is a well-established seller of permanganate, an oxidant that can be used with SES's technology. (DRPSF ¶¶ 6, 10–11.) It has advertised itself as "the world leader in permanganate technologies" and claimed that "[t]he Carus name is synonymous with permanganate." (*Id.* ¶ 11.) At the time of SES's outreach, Carus had an established business selling permanganate for remediation and a portfolio of products it sold for remediation, wastewater treatment, and municipal water treatment. (*Id.*) Between 2008 and 2017, Carus's annual revenues varied between $94 and $105 million. (*Id.* ¶ 12.)

In December 2008, Carus and SES entered into an agreement under which the Swearingens could disclose confidential aspects of SES's technology to Carus while preserving the technology's proprietary status. (*Id.* ¶ 13.) The Swearingens subsequently met with Carus's then-Global Marketing Manager for its Carus Remediation Technologies division, Matt Dingens, on January 9, 2009, to give a presentation on their technology. (*Id.* ¶ 15.) During that meeting, the

---

[2] While Carus disputes SES's characterization of its technology, contending it has limited application (DRPSF ¶ 7), there is no dispute that SES represents its technology as providing the benefits described above.

[3] As of the date of SES's motion for partial summary judgment, it has been awarded thirteen U.S. patents. (DRPSF ¶ 9.)

Swearingens showed Dingens numerous embodiments of SES's technology, including several wax and potassium permanganate dispersions. (*Id.*) In most (but not all) of those embodiments, the potassium permanganate particles were not completely encapsulated within the wax. (*Id.* ¶ 16.) After their meeting with Dingens, Carus invited the Swearingens to give a presentation to about a dozen of the company's technological and sales and marketing personnel, focusing on microencapsulated embodiments that could be injected into soil. (*Id.* ¶¶ 18–19.) Again, the Swearingens showed embodiments that were not completely encapsulated. (*Id.* ¶ 20.) They also left samples of SES's technology with Carus, all of which were not completely encapsulated. (*Id.*)

Carus decided after its meetings with the Swearingens that it wanted to purchase the patents, technology, and other intellectual property relating to SES's technology. (*Id.* ¶ 21.) Accordingly, Carus proposed that SES assign to Carus all right, title, and interest in its technology. (DRPSF ¶ 21; PRDSF ¶ 14.) SES refused Carus's offer and instead would only consider an exclusive license to Carus as opposed to an assignment. (*Id.*) Therefore, the parties entered into a letter of intent dated March 17, 2009, which awarded Carus a 120-day testing and exclusivity period to allow it to further test and evaluate the viability and economic feasibility of SES's technology. (DRPSF ¶ 22.) Much of the testing Carus did of SES's technology involved samples that were not completely encapsulated. (*Id.* ¶ 28.) Carus completed its vetting process on June 1, 2009, and determined that it wanted an exclusive license to SES's technology. (*Id.* ¶ 23.) While Carus sought an exclusive license to SES's technology for the lifetime of any of SES's intellectual property rights, SES rejected that length of exclusivity. (DRPSF ¶ 23; PRDSF ¶ 22.)

Ultimately, Carus and SES's negotiations culminated in the Exclusive Licensing and Technology Agreement ("License Agreement") that the parties entered into on August 31, 2009. (DRPSF ¶¶ 30, 45; PRDSF ¶ 19.) Under the License Agreement, Carus was granted an exclusive

license—even as to SES—to market and sell SES's technology for a period of three years. (DRPSF ¶ 31; PRDSF ¶ 22.) After three years, either party had the right to convert Carus's license into a nonexclusive license; prior to that time, the exclusive license could only be terminated for cause. (DRPSF ¶ 23; PRDSF ¶ 50.) Altogether, the License Agreement had a term to last the longer of 20 years or the last to expire of SES's patents. (DRPSF ¶ 31.) In exchange, Carus paid SES $50,000 up front and further promised to pay royalties (referred to in the License Agreement as a "license fee") on its sales of the "Licensed Products." (*Id.* ¶¶ 32, 46.) The License Agreement defines "Licensed Products" to mean

> the product(s) made, have made, developed, used, sold, marketed, distributed or sold by Carus that incorporate the SOCOR Technology, the SES Patents, the SES Background IP, [duplicate omitted] or the SES Technical Information. For the avoidance of doubt, the Licensed Products do not include the Carus Product.

(*Id.* ¶ 33.) Further, the License Agreement defines several of the terms used in the definition of Licensed Products. "SOCOR Technology" means

> any encapsulation technology developed, conceived or discovered by SES for various oxidants, including the selective oxidation and controlled oxidant release technologies, as amended or modified with one or more components of, or new developments thereto, including but not limited to use of potassium permanganate or sodium persulfate,[4] Technical Information, and Intellectual Property owned, controlled or licensed by SES and its Affiliates, related to such technologies.

(*Id.* ¶ 35.) "SES Patents" is defined as

> any Patents relating to the SOCOR Technology, including US Patent No. 7,431,849B1 and any patents that issue from the US Patent Application Publications No. US2008/0275288A1 and US2009/0061082A1, and any corresponding Patents in other countries and any other present and future patent applications filed thereon or which cover improvements to the SOCOR Technology during the term of this Agreement.

(*Id.* ¶ 34.) And "Technical Information" is defined to mean:

---

[4] Persulfate is another oxidant that can be used with SES's technology. (DRPSF ¶ 6.)

> the data, trade secrets, know-how, and other information which may be
> Confidential Information, whether or not patentable or copyrightable, including but
> not limited to marketing information, sales information, technical reports, research
> and development information, and information contained in the patents and patent
> applications of the Licensed Inventions, including but not limited to Appendix A.[5]

(*Id.* ¶ 36.)

Each party was required under the License Agreement "to use commercially reasonable efforts to develop the market for the Licensed Product." (PRDSF ¶¶ 23, 26.) However, the License Agreement did not define what was meant by "commercially reasonable efforts." (*Id.* ¶ 26.) Nor did it require Carus to sell any specific amount of the Licensed Products over any particular period of time or spend a specific minimum amount of money toward commercializing the Licensed Products. (*Id.* ¶¶ 30–31.) At the time that Carus and SES entered into the License Agreement, SES had never commercially sold a product embodying its technology. (*Id.* ¶ 29.) And Carus claims the technology remained unproven—a contention that SES disputes. (*Id.*)

In 2009 and 2010, Carus made no sales of any Licensed Products. (DRPSF ¶ 37.) Carus apparently takes the position in this litigation that it was never able to commercialize SES's technology or otherwise sell any Licensed Product. (Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J. at 2, 4, 7, Dkt. No. 268.) On the other hand, SES contends that Carus ultimately sold three products that met the License Agreement's definition of Licensed Products: RemOx SR, Pursulfate SR, and RemOx SR+[6] (collectively, "SR Products"). (DRPSF ¶¶ 37–38, 43–44; Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. at 1–2, 9, 12, Dkt. No. 245.) In 2011, Carus made its first sales of RemOx SR. (DRPSF ¶ 37.) The technology used in RemOx SR was then used as the foundation for additional research that was used to develop Persulfate SR and RemOx SR+. (*Id.*

---

[5] No Appendix A was actually included as part of the License Agreement. (DRPSF ¶ 36.)

[6] RemOx SR+ was also sold under the names MultiOx and MultiOx SR. (DRPSF ¶ 38.)

¶ 42.) All three products are nearly identical in all material respects with only the oxidant varying between them. (*Id.* ¶ 53.) While RemOx SR uses potassium permanganate, Persulfate SR uses sodium persulfate and RemOx SR+ uses half potassium permanganate and half sodium persulfate. (*Id.* ¶¶ 53–55.) Carus made its first sales of Persulfate SR in 2013 and made its first sales of RemOx SR+ in 2015. (*Id.* ¶ 37.)

Through 2017, Carus's sales of the SR Products totaled $555,529. (*Id.* ¶¶ 37, 43.) Initially, Carus paid royalties for its sales of RemOx SR, making eight separate payments between February 2012 and August 2013 adding up to $27,864. (*Id.* ¶¶ 41, 61.) After its final payment in August 2013, Carus continued to sell RemOx SR but ceased making royalty payments for those sales and never paid any royalties for its sales of Persulfate SR and RemOx SR+. (*Id.* ¶ 43.) Under the License Agreement, the royalties Carus owed for its $555,529 sales of the SR Products would have been $75,547 insofar as those products constitute Licensed Products. (*Id.* ¶¶ 44, 61.) Thus, subtracting the royalties Carus actually paid for its sales of RemOx SR leaves approximately $47,683 in unpaid royalties. (*Id.*)

On December 5, 2012, SES notified Carus that it was exercising its right to convert Carus's exclusive license in SES's technology into a nonexclusive license. (*Id.* ¶ 50.) Shortly thereafter, Carus stopped providing SES with sales reports as required by a provision of the License Agreement. (*Id.* ¶ 62.) In its first year after converting Carus's license, SES sold over $600,000 worth of products incorporating its technology. (*Id.* ¶ 39.)

## DISCUSSION

SES's five-count First Amended Complaint sets forth claims against Carus for breach of contract (Count I),[7] breach of fiduciary duty (Count II), common law fraud (Count III),

---

[7] Count I alleges five different breaches of the License Agreement. (First Am. Compl. ¶ 93, Dkt. No. 207.)

promissory fraud (Count IV), and constructive fraud (Count V). Both Carus and SES have moved for summary judgment. Carus seeks summary judgment on all five counts[8] of the First Amended Complaint. By contrast, SES only seeks partial summary judgment on its claim that Carus breached the License Agreement by failing to pay royalties on certain of its sales of the Licensed Products as well as its common law fraud claim. In addition, SES has also filed a motion to strike the expert reports and opinions of two of Carus's experts. The Court first addresses SES's motion to strike before turning to the parties' motions for summary judgment.

## I.      SES's Motion to Strike Expert Reports and Opinions

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"In *Daubert*, the Supreme Court interpreted Rule 702 to require the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir.

---

[8] Although Carus requests summary judgment be entered in its favor on the breach of contract claim in Count I of the First Amended Complaint, its motion is directed only toward one of the five alleged breaches of the License Agreement—Carus's purported failure to use commercially reasonable efforts to develop the market for the Licensed Products. Consequently, a ruling in Carus's favor on the breach of contract claim would not entirely dispose of the claims set forth in Count I.

13

2017) (internal quotation marks omitted). The district court's gatekeeping function requires the court to engage in a three-step analysis before admitting expert testimony. *Id.* at 779. Specifically, it must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Id.* The proponent of the expert bears the burden of demonstrating by a preponderance of the evidence that the expert's testimony satisfies the *Daubert* standard. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). SES's motion is directed at two of Carus's experts. Specifically, SES seeks to partially strike Michelle Crimi's expert report to the extent she opines on Carus's marketing efforts and to entirely exclude the expert report and opinions of George Wheeler.

### A.    Crimi

Carus has retained Dr. Michelle Crimi to provide an expert opinion on the development and effectiveness of the controlled release oxidation technology underlying SES's technology, along with Carus's efforts at marketing that technology. Crimi has a B.S. in Industrial Hygiene and Environmental Toxicology, an M.S. in Environmental Health, and a Ph.D. in Environmental Science and Engineering. Since earning her Ph.D., Crimi has spent the entirety of her career in academia. Currently, she serves as a professor and director of Engineering and Management at Clarkson University. Crimi states that she has recognized expertise in groundwater remediation with a focus on in situ chemical oxidation.

While SES does not challenge Crimi's expert opinions with respect to the development and effectiveness of controlled release oxidation technology, it contends that she is unqualified to testify about Carus's marketing efforts. In particular, SES contends that Crimi is an academic who has neither studied marketing nor commercialized a product, and therefore lacks the knowledge, skill, experience, or education to opine on marketing issues. The Court agrees that nothing in

Crimi's CV suggests that she is qualified to offer an expert opinion on Carus's efforts at marketing SES's technology. Indeed, her education, experience, and training strongly resemble that of SES's expert, Stephanie Luster-Teasley, whom this Court previously determined was unqualified to offer an expert opinion on Carus's marketing efforts. *Specialty Earth Scis., LLC v. Carus Corp.*, No. 15-cv-06133, 2020 WL 7027441, at *4 (N.D. Ill. Nov. 30, 2020).

Carus does not even attempt to argue that Crimi is qualified to opine on marketing issues. Rather, it emphasizes that Crimi was disclosed as both an expert witness and a fact witness. Carus states that Crimi will be a fact witness in this matter because Carus had hired her as an independent technical consultant to assist in its efforts to develop and market SES's technology. Based on her personal involvement in Carus's commercialization efforts, Crimi will testify that that SES's technology was largely ineffective for purposes of groundwater remediation and consequently there was a limited market for the Licensed Products. Thus, Carus claims that SES's motion to strike is an improper attempt to prevent Crimi from testifying about how the factual matters within her knowledge inform her expert opinions.

It is true that "[a] witness can qualify as both a fact and expert witness and an expert may base an opinion on fact or data in the case that the expert has personally observed." *United States v. Christian*, 673 F.3d 702, 708 (7th Cir. 2012). "So-called 'dual-role testimony' is permissible, though district courts must guard against the inherent danger that the jury may conflate a witness's lay testimony with the portion of that witness's testimony that is expert." *Patterson v. Baker*, 990 F.3d 1082, 1085 (7th Cir. 2021). Carus's contention that Crimi is not offering an expert opinion on Carus's marketing of SES's technology is belied by Crimi's own report, which she begins by stating that she "was asked by Carus Corporation to provide my ***expert opinion*** on the development, effectiveness, and ***marketing efforts*** related to controlled release oxidation

technologies for groundwater remediation." (Pl.'s Mot. to Strike Def.'s Experts, Ex. 1, Expert Report of Michelle Crimi at 2, Dkt. No. 252-1 (emphasis added).) Moreover, Crimi does not simply report on the efforts that Carus took to market SES's technology but also offers her "professional opinion" that those efforts were "extensive" and "remarkable." (*Id.* at 14–15); *see* Fed. R. Evid. 701(c) ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . not based on scientific, technical or other specialized knowledge within the scope of Rule 702."). Because not even Carus contends that she is qualified to opine on marketing issues, Crimi will not be permitted to testify as an expert concerning Carus's efforts at marketing SES's technology.

Certainly, Crimi can testify about how her personal experience informs her opinions on the development and effectiveness of SES's technology, issues upon which she is qualified to opine. And Crimi may potentially even be able to provide fact testimony at trial regarding her involvement in Carus's efforts at marketing the Licensed Products, subject to appropriate cautionary measures. *See United States v. Mansoori*, 304 F.3d 635, 654 (7th Cir. 2002) ("Although we have acknowledged that there is a greater danger of undue prejudice . . . when a witness testifies as both an expert and a fact witness . . . . [t]his potential for prejudice . . . can be addressed by means of appropriate cautionary instructions and by examination of the witness that is structured in such a way as to make clear when the witness is testifying to facts and when he is offering his opinion as an expert."). But Crimi will not be permitted to offer an expert opinion on the nature or quality of Carus's marketing efforts. SES's motion to partially strike Crimi's expert report and opinions is therefore granted.

### B.    Wheeler

Next, SES seeks to strike the entirety of George Wheeler's expert report and opinions on the nature of the technology covered by the License Agreement's definition of Licensed Products. Since 1978, Wheeler has worked as a patent attorney, regularly drafting and prosecuting patent applications in the United States and around the world. During his career, Wheeler has been exposed to encapsulation and microencapsulation technologies, although he concedes he is not a technical expert in those technologies.

In his expert report, Wheeler states that his role is to give an opinion on the subject matter covered and not covered by the License Agreement. His analysis begins by looking at the defined terms contained in the License Agreement's definition of Licensed Products. In particular, he focuses on the definition of SOCOR Technology, which encompasses "any encapsulation technology developed, conceived or discovered by SES for various oxidants." From that, Wheeler concludes that a product must incorporate "encapsulation technology" to be a Licensed Product. He then turns to consider what Carus and SES meant by "encapsulation technology" when they entered into the License Agreement. In undertaking that inquiry, Wheeler considers dictionary definitions of the words "encapsulate" and "encapsulated," as well as SES's patents and patent application materials. Ultimately, Wheeler concludes that an oxidant product can only be considered a Licensed Product if it is completely encapsulated. And because the SR Products are only partially encapsulated, they cannot be deemed Licensed Products.

SES takes issue with Wheeler's qualifications and the reliability and usefulness of his testimony. But as a threshold matter, it contends that Wheeler's testimony will not assist the trier of fact because he inappropriately opines on the proper interpretation of the License Agreement. Ordinarily, an expert may not be called to explain the meaning of a contract. *See, e.g.*, *RLJCS*

*Enters., Inc. v. Pro. Benefit Tr. Multiple Emp. Welfare Benefit Plan & Tr.*, 487 F.3d 494, 498 (7th

Cir. 2007) ("Argument about the meaning of . . . contracts . . . belong in briefs, not in 'experts'

reports.'"); *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir. 1969) ("The question of interpretation

of the contract is for the jury and the question of legal effect is for the judge. In neither case do we

permit expert testimony."). Here, the Court finds that Wheeler's expert report amounts to an

extended interpretation of the phrase "encapsulation technology" as used in the License

Agreement—his conclusion being that it requires the complete encapsulation of an oxidant.

Indeed, Wheeler expressly consults the dictionary in the course of his analysis, a common step

employed by courts in interpreting contractual language. *See, e.g.*, *Valley Forge Ins. Co. v.

Swiderski Elecs., Inc.*, 860 N.E.2d 307, 316 (Ill. 2006) (looking to dictionary definitions to

determine the plain and ordinary meanings of undefined terms in a contract). Moreover, he

ascribes a limited scope to that phrase by reading it in the context of other provisions in the

License Agreement. *Darvosh v. Lewis*, 66 F. Supp. 3d 1130, 1136 (N.D. Ill. 2014) ("The Court

does 'not view portions, terms, clauses, or language in the contract in isolation,' but rather views

each provision in light of its context within the entire document." (quoting *St. Paul Mercury Ins.

v. Aargus Sec. Sys., Inc.*, 2 N.E.3d 458, 478 (Ill. App. Ct. 2013))); *Scottsdale Ins. Co. v. City of

Waukegan*, 689 F. Supp. 2d 1018, 1023 (N.D. Ill. 2010) (striking expert testimony that explained

"how certain parts of the contract are modified by other parts" because those "opinions usurp[ed]

the Court's role in interpreting the language contained" in the contract). And at one point in his

report, Wheeler acknowledges that he has worked in his capacity as Carus's expert to

"determin[e] the ***meaning and scope*** of 'encapsulation technology developed, conceived or

discovered by SES.'" (Pl.'s Mot. to Strike Def.'s Experts, Ex. 4, Expert Report of George

Wheeler at 38, Dkt. No. 252-1 (emphasis added).)

18

In response, Carus argues that the rule against expert opinion on the interpretation of a contract does not apply where, as here, the meanings of the disputed contract terms are ambiguous. It is true that expert opinion on the meaning of an ambiguous contract term is sometimes "a permissible aid to interpretation." *Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 365 (7th Cir. 1990). However, "only experts with the proper legal background ([such as] a lawyer with experience regarding the type of contractual provisions at issue) may offer such testimony." *In re Ocean Bank*, 481 F. Supp. 2d 892, 898 (N.D. Ill. 2007). Moreover, their opinion is only admissible insofar as it is "used to establish the meaning of an ambiguous contract term in light of the industry's custom and practice." *Anderson v. Fel-Pro Chem. Prods., LP*, No. 95 C 4604, 1996 WL 33410082, at *6 (N.D. Ill. Dec. 19, 1996); *see also Int'l Surplus Lines Ins. Co. v. Fireman's Fund Ins. Co.*, No. 88 C 320, 1992 WL 22223, at *3 (N.D. Ill. Jan. 31, 1992) ("Absent any need to clarify or define terms of art, science or trade, expert opinion testimony to interpret contract language is inadmissible.").

Here, Wheeler's experience is with patents, not licensing contracts. Nor does he state that he has ever had experience with contracts using the term "encapsulation technology." And Wheeler does not have any experience specific to the environmental remediation industry. While Wheeler states that he has had some general exposure to encapsulation technologies, he concedes that he does not consider himself a technical expert in those technologies. (Pl.'s Mot. to Strike Def.'s Experts, Ex. 4, Expert Report of George Wheeler at 6.) In short, to the extent that expert testimony on the proper interpretation of "encapsulation technology" is otherwise admissible, Wheeler is unqualified to opine on the subject. *See Int'l Surplus Lines Ins. Co.*, 1992 WL 22223, at *3 ("An expert cannot testify regarding the meaning that a trade gives a contract provision if he has never seen such a provision."); *see also Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d

19

1356, 1363 (Fed. Cir. 2008) ("[P]atent lawyers are often qualified to testify as technical experts, but such a qualification must derive from a lawyer's technical qualifications in the pertinent art.").

At bottom, Wheeler's expert opinion that the SR Products are not Licensed Products relies upon his legal conclusion that the meanings of "encapsulation technology" and other License Agreement terms must be understood by reference to the technology covered by the defined term SES Patents. That is an issue of contract interpretation outside both Wheeler's expertise and the permissible bounds of expert opinion. For that reason, SES's motion to strike Wheeler's expert report and opinions is granted.

## II.    Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Here, both SES and Carus move for summary judgment in their favor as to the common-law fraud claim but otherwise their motions address different claims in the First Amended Complaint. The Court addresses in turn each claim at issue in the motions for summary judgment.

### A.    Breach of Contract—Failure to Pay Royalties on Licensed Products Sales

According to SES, Carus made $555,529 in sales of the SR Products—which SES contends are Licensed Products—but paid SES only $27,864 of the $75,547 in royalties it owed under the License Agreement. Therefore, SES seeks summary judgment on its claim that Carus breached the License Agreement by failing to pay the full amount of the royalties it owed on

Licensed Product sales. However, Carus contends that there is at least a question of fact as to whether the SR Products are Licensed Products.

The License Agreement expressly states that it should be interpreted in accordance with Illinois law and neither party denies that Illinois law governs SES's breach of contract claims. An Illinois-law breach of contract claim requires: "(1) the existence of a valid and enforceable contract; (2) the performance of the contract by plaintiff; (3) the breach of the contract by defendant; and (4) a resulting injury to plaintiff." *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001). Here, the parties' dispute focuses on whether Carus breached the License Agreement by failing to pay royalties on its sales of the SR Products. Specifically, the parties disagree as to whether these products are Licensed Products for which SES is owed royalties. Carus claims that the term Licensed Products is ambiguous because the License Agreement never specifically identifies the bounds of the technology encompassed by the definition of Licensed Products. And because the SR Products each were based on new inventions and techniques distinguishable from SES's technology, Carus argues that a jury should determine whether those products are Licensed Products.

In Illinois, "[c]ontracts 'must be construed to give effect to the intention of the parties which, when there is no ambiguity in the terms of the contract, must be determined from the language of the contract alone.'" *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998) (quoting *Flora Bank & Tr. v. Czyzewski*, 583 N.E.2d 720, 725 (Ill. App. Ct. 1991)). A contract term will be deemed ambiguous "if the language of the contract is obscure in meaning through indefiniteness of expression." *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004); *see also Intersport, Inc. v. Nat'l Collegiate Athletic Ass'n*, 885 N.E.2d 532, 539 (Ill. App. Ct. 2008) ("A contract term is ambiguous if it can reasonably be interpreted in more than

21

one way due to the indefiniteness of the language or due to the terms having more than one meaning."). However, "[a] contract is not rendered ambiguous merely because the parties disagree on its meaning." *Cent. Ill. Light Co.*, 821 N.E.2d at 214. Whether a contract is ambiguous is a question of law for the court. *Id.*

Not even SES asserts that the scope of the technology encompassed by the definition of Licensed Products and the defined terms therein can be determined based on the language of the License Agreement alone. The Court agrees with Carus that the License Agreement does not specify the full range of technology it covers. Clearly, the licensed technology is broader than just SES's patented technology, as the definition of Licensed Products covers not just products incorporating the SES Patents but also the SOCOR Technology, the SES Background IP, and SES Technical Information. Similarly, the SOCOR Technology must be broader than the SES Patents, as otherwise it would be redundant to separately define SOCOR Technology and include it in the definition of Licensed Products. *See White v. White*, 378 N.E.2d 1255, 1258 (Ill. App. Ct. 1978) ("[I]n construing a contract, meaning and effect must be given to every part, and no part should be rejected as surplusage unless absolutely necessary since it is presumed that each provision was inserted deliberately and for a purpose."). But it is unclear the precise contours of the technology captured by the definition of SOCOR Technology, as the language of the License Agreement does little to describe the "encapsulation technology developed, conceived or discovered by SES." The same goes for the "data, trade secrets, know-how, and other information" contained in the definition of Technical Information. Thus, the Court finds that the License Agreement is ambiguous as to the nature of the technology incorporated in Licensed Products.

When a contract is ambiguous, a court may consider extrinsic evidence to aid in its interpretation. *E.g.*, *Gomez v. Bovis Lend Lease, Inc.*, 22 N.E.3d 1, 4 (Ill. App. Ct. 2013). In

considering extrinsic evidence, the court's objective is to ascertain the parties' intent. *See, e.g.*, *Pamado, Inc. v. Hedinger Brands, LLC*, 785 F. Supp. 2d 698, 706 (N.D. Ill. 2011). Relevant extrinsic evidence includes evidence concerning "the circumstances surrounding the formation of a contract or . . . the conduct of the parties subsequent to its formation." *Szafranski v. Dunston*, 34 N.E.3d 1132, 1157 (Ill. App. Ct. 2015). "[A] court may consider preliminary negotiations between the parties in order to determine the meaning of contract provisions and the intent of the parties." *Regency Com. Assocs., LLC v. Lopax, Inc.*, 869 N.E.2d 310, 316 (Ill. App. Ct. 2007). The course of the parties' performance under the contract also "may be used to interpret the intent of the parties, since such evidence likely reflects the parties' understanding of their agreement." *Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 891 (N.D. Ill. 2001); *see also Chi. & N.W. Ry. Co. v. Peoria & Pekin Union Ry. Co.*, 360 N.E.2d 404, 407 (Ill. App. Ct. 1977) ("The parties to an agreement are in the best position to know what they meant, and their action under the contract is often the strongest evidence of their intended meaning."). And contrary to Carus's contention that construing an ambiguous contract is a question of fact not suitable for summary judgment, in Illinois, the interpretation of an ambiguous contract "is a question of law for the court as long as the extrinsic evidence bearing on the interpretation is undisputed." *Baker v. Am.'s Mortg. Servicing, Inc.*, 58 F.3d 321, 326 (7th Cir. 1995).

Carus contends that SES's "encapsulation technology" is limited solely to technology involving the complete encapsulation of an oxidant and that is the only technology that the parties intended to be subject to the License Agreement. Therefore, Carus asserts that none of the SR Products can be considered a Licensed Product because they use only partial encapsulation technology. However, SES points to ample undisputed evidence of both the parties' negotiations

and course of performance that demonstrates that the parties did not intend to limit Licensed Products to only completely encapsulated products.

First, when SES gave its initial presentations on its technology to Carus, many of the embodiments it showed to Carus were not completely encapsulated. (DRPSF ¶¶ 15–16, 20.) Moreover, while the parties negotiated the License Agreement, Carus continued to evaluate SES's technology, often using samples that were not completely encapsulated. (*Id.* ¶ 28.) After the parties entered into the License Agreement, Carus publicly referred to the partially encapsulated embodiments as "encapsulated" and employing "encapsulated oxidant" technology both internally and publicly. (*Id.* ¶¶ 28–29.) During the development and initial stages of commercializing RemOx SR, Carus consistently treated it as a Licensed Product. When Carus began to market RemOx SR, it published a product information sheet stating that "[t]he method of encapsulation of the oxidant was developed by [SES]" and "Carus Corporation is the exclusive licensee of this technology." (*Id.* ¶ 52.) Internally, Carus repeatedly acknowledged that RemOx SR was a Licensed Product. (*Id.* ¶¶ 49–52, 56, 59.) Accordingly, Carus paid royalties to SES on its initial sales of RemOx SR. (*Id.* ¶¶ 41, 43–44, 61.) Notably, following SES's conversion of Carus's license from exclusive to nonexclusive, Carus only made a few more royalty payments before they ceased altogether. (*Id.* ¶¶ 41, 43.)

Although Carus never paid royalties on its sales of Persulfate SR and RemOx SR+, when Persulfate SR was in an experimental stage, Carus acknowledged that it would be a Licensed Product. (*Id.* ¶¶ 51, 56.) The undisputed evidence further shows that the RemOx SR technology was the foundation for Persulfate SR and RemOx SR+. (*Id.* ¶ 42.) Indeed, the three SR Products are nearly identical in all material respects save for the oxidant used. (*Id.* ¶¶ 53–55.) Consequently, the evidence of Carus's course of performance as to RemOx SR is equally as

instructive as to Persulfate SR and RemOx SR+. And viewing SES's evidence concerning the circumstances of the formation of the License Agreement and the parties' course of performance as a whole, the Court concludes that the parties understood the SR Products to be Licensed Products despite the fact that none of those products used complete encapsulation technology.

By contrast, Carus has no evidence that would create a factual issue for the jury, especially in light of its Local Rule 56.1 violations and the exclusion of Wheeler's expert testimony. In any case, Carus's arguments against summary judgment would be unavailing even considering the new facts introduced in its brief or derived from Wheeler's expert report. As an initial matter, Carus makes much of the fact that earlier in the litigation, SES identified a longer list of Carus products that it believed qualified as Licensed Products before narrowing it down to the three at issue here. But the fact that SES may have taken a more aggressive position earlier in the litigation does nothing to undermine the evidence of the parties' actual performance under the contract. *See Nat'l Cleaning Contractors, Inc. v. Montauk Co.*, No. 88 C 6432, 1990 WL 43356, at *6 (N.D. Ill. Mar. 30, 1990) ("[I]f the parties have, by their conduct, clearly adopted a particular construction, the court will adopt that construction as a matter of law, the parties' later claims in litigation notwithstanding."); *see also Lexington Ins. Co. v. RLI Ins. Co.*, 949 F.3d 1015, 1025 (7th Cir. 2020) ("As a matter of Illinois law and common sense, the parties' statements during negotiations and their conduct afterward carry more weight than legal interpretations offered in the run-up to litigation.").

Carus also contends that its ability to obtain two U.S. patents for the technology underlying the SR Products demonstrates that the technology is distinct from SES's patented technology. Of course, Carus was awarded those patents well after the execution of the License Agreement (and after the initiation of this action). And "[c]ontracts must be construed and given

effect with reference to the intention of the parties at the time of entering into them." *Kroll v. Sugar Supply Corp.*, 452 N.E.2d 649, 654 (Ill. App. Ct. 1983). Thus, the Court finds that the United States Patent and Trademark Office's decision[9] that there was a patentable distinction between the SR Products' technology and SES's patents has little probative value with respect to the parties' view of the scope of SES's technology at the time they entered into the License Agreement. Furthermore, as the Court has already noted, the definition of Licensed Products necessarily encompasses more technology than that covered by the definition of SES Patents. Indeed, License Products includes not only "any encapsulation technology developed, conceived or discovered by SES" but also any amendments or modifications to that technology involving "one or more components of, or new developments thereto." Whether Carus was properly awarded patents for the SR Products' technology is not a question for this Court. It is enough that the parties clearly viewed and treated the SR Products as Licensed Products.

In sum, the undisputed evidence of the circumstances of the formation of the License Agreement and the parties' course of performance under the agreement allows the Court to rule as a matter of law that the SR Products are Licensed Products. For that reason, SES's motion for summary judgment is granted as to its claim that Carus breached the License Agreement by failing to pay all royalties owed on its sales of the SR Products.

### B.    Breach of Contract—Commercially Reasonable Efforts

Carus seeks summary judgment on SES's claim that Carus breached its obligation under the License Agreement to use commercially reasonable efforts to develop the market for the

---

[9] SES is currently contesting the United States Patent and Trademark Office's decision to award Carus patents for the technology underlying the SR Products, as it has filed a declaration of interference with the United States Patent and Trademark Office's Patent Trial and Appeal Board alleging that Carus derived its patents from SES's patents. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. at 14, Dkt. No. 268; *Id.* Ex. 10, Dkt. No. 268-10.)

Licensed Products. It first claims that the promise to use "commercially reasonable efforts" is too indefinite and uncertain to be enforceable. Next, even if the commercially reasonable efforts clause is enforceable, Carus claims that the facts show that it undertook substantial efforts to commercialize the Licensed Products. Finally, Carus argues that the breach of contract claim must fail because SES cannot establish with a reasonable certainty the damages it sustained from Carus's alleged failure to use commercially reasonable efforts.

*i.       Enforceability*

To argue that the License Agreement's commercially reasonable efforts clause is unenforceable, Carus analogizes it to "best efforts" clauses that many Illinois courts have refused to enforce. Specifically, many courts applying Illinois law have found a party's promise to use best efforts is too indefinite and uncertain to be an enforceable standard. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992); *Kraftco Corp. v. Kolbus*, 274 N.E.2d 153, 156 (Ill. App. Ct. 1971). Nonetheless, "'best efforts' agreements are not *per se* unenforceable under Illinois law." *Maurice Sporting Goods, Inc. v. BB Holdings, Inc.*, No. 15-cv-11652, 2016 WL 4439948, at *4 (N.D. Ill. Aug. 23, 2016). Rather, they are only unenforceable "if no criteria exist by which to measure the effort." *Clever Ideas, Inc. v. Citicorp Diners Club, Inc.*, No. 02 C 5096, 2003 WL 21982141, at *15 (N.D. Ill. Aug. 20, 2003). Thus, some courts have enforced "best efforts" clauses where the contract "also contains some objective criteria by which to judge whether the proper effort has been made." *Id.* at *16.

According to Carus, because the License Agreement is devoid of objective criteria by which to measure the commercial reasonableness of its efforts to market the License Products, the commercially reasonable efforts clause is unenforceable. As an initial matter, in the context of an exclusive licensing relationship, one court has enforced a "best efforts" clause, finding it to be an

express articulation of the implied obligation "to use good faith, reasonable efforts" in selling the licensed product. *Gentieu v. Tony Stone Images/Chi., Inc.*, 255 F. Supp. 2d 838, 868 (N.D. Ill. 2003). Regardless, the Court believes that Carus is incorrect to equate the License Agreement's commercially reasonable efforts clause to an unenforceable "best efforts" clause. The Seventh Circuit has observed that the problem with unenforceable "best efforts" promises is that they are "[s]tatements of an informal character expressing goodwill and hope for association [that] are too vague to be enforceable as contract provisions." *Beraha*, 956 F.2d at 1441. By contrast, the promise to undertake commercially reasonable efforts has a far more definite character. Indeed, the Seventh Circuit has found "reasonable efforts" clauses to be enforceable in Illinois. *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 278 (7th Cir. 1996). In *Roboserve*, it recognized that a clause requiring a hotel corporation to use "reasonable endeavors" to promote the plaintiff's minibars was "somewhat vague" but nonetheless found that it still had meaning and was enforceable. *Id.*; *see also Marusiak v. Adjustable Clamp Co.*, No. 01 C 6181, 2005 WL 2420370, at *6 (N.D. Ill. Sept. 30, 2005) ("A contract requirement that a party use 'good faith' to 'build up and diligently extend' the business of marketing a product as 'rapidly and fully as practicable' may be somewhat vague, but it has substantial meaning and is enforceable."); *Honkomp v. Dixon*, 422 N.E.2d 949, 951 (Ill. App. Ct. 1981) (finding that a promise to use "'reasonable efforts' should be interpreted in the light of the principles of good faith and fair dealing"). And here, the promise to use reasonable efforts is given further meaning by the addition of the adverb "commercially." Indeed, "commercial reasonableness" is a familiar standard used in a variety of commercial contexts. *See, e.g.*, *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 763 (7th Cir. 2010) ("[T]he term 'commercially reasonable manner' is a commonly employed term in commercial transactions."). The Court therefore rejects Carus's contention that

the License Agreement's "commercially reasonable efforts" clause is too indefinite and uncertain to be enforceable.

          ii.         *Breach*

Next, Carus contends that it undertook substantial efforts to market the Licensed Products and therefore it is entitled to summary judgment even if the "commercially reasonable efforts" clause is enforceable. In the context of "reasonable efforts" clauses, the Seventh Circuit has recognized that "[t]he question of what is 'reasonable' under a contract is an issue of fact for the trier of fact." *Roboserve*, 78 F.3d at 278. Courts outside this Circuit have similarly recognized that the "commercial reasonableness" inquiry is generally a fact issue for the jury. *Eastwood Ins. Servs., Inc. v. Titan Auto Ins. of N.M., Inc.*, 469 F. App'x 596, 598 (9th Cir. 2012) ("Commercial reasonableness primarily involves questions of fact, based on all the circumstances." (internal quotation marks and alteration omitted)); *Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 926 (E.D. Cal. 2010) ("Whether [a party] exerted commercially reasonable efforts is a factually intense issue.").

Carus contends that the commercial reasonableness of its efforts is demonstrated by the fact that it spent between $600,000 and $1,200,000 on marketing the Licensed Products during the period it held an exclusive license to SES's technology. (PRDSF ¶ 38.) Further, Carus frequently held conference calls with SES to discuss the development and promotion of the Licensed Products. (*Id.* ¶ 39.) And Carus marketed RemOx SR[10] to its customers through a variety of means. (*Id.* ¶¶ 45–47.) Ultimately, Carus asserts that the reason that the Licensed Products did not

---

[10] Notably, Carus touts its efforts at marketing RemOx SR to argue that it made commercially reasonable efforts to market the Licensed Products while also claiming that RemOx SR is not a Licensed Product when resisting SES's motion for summary judgment regarding Carus's failure to pay royalties on sales of the Licensed Products.

enjoy commercial success is because the products did not work, as evidenced by their poor performance in field trials conducted by environmental engineering firms.[11]

Yet, SES has adequately disputed many of the facts concerning Carus's efforts at marketing the Licensed Products. For example, it points to evidence suggesting that Carus spent only about $200,000 on marketing the Licensed Products. (PRDSF ¶ 38.) SES has also presented its own additional facts suggesting that Carus's efforts were far from sufficient. It highlights evidence showing that Carus provided limited sales and technical support resources to the Licensed Products. (Def.'s Resp. to Pl.'s Statement of Additional Facts ("DRPSAF") ¶ 10, Dkt. No. 287.) In addition, SES contends that Carus unnecessarily delayed in taking steps toward manufacturing the Licensed Products at an adequate scale. (*Id.* ¶¶ 11–12.)

Following its conversion of Carus's exclusive license, SES was able to sell over $600,000 worth of products incorporating its technology in a single year, exceeding Carus's total sales of Licensed Products between 2009 and 2017. (DRPSF ¶¶ 37, 39.) Moreover, Carus's actual sales of the Licensed Products paled in comparison to its annual revenues from that period and fell well short of its own internal projections. (DRPSAF ¶¶ 28–29, 39–42.) And SES argues that Carus's contention that its technology did not work is belied by the fact that SES has successfully used products embodying its technology at several sites across the country. (*Id.* ¶ 30.) SES also suggests that Carus preferred to continue selling its old products to customers as opposed to commercializing the Licensed Products because sales of the old products yielded greater profits. (*Id.* ¶ 13.) Based on this evidence, the Court finds that SES has sufficiently demonstrated an issue of fact regarding the commercial reasonableness of Carus's efforts at marketing the Licensed

---

[11] There is no factual assertion provided in Carus's statement of material facts to support its contention that SES's technology fared poorly in field trials.

Products. Consequently, it is for the trier of fact to determine from the parties' evidence whether or not Carus breached the License Agreement's commercially reasonable efforts clause.

*iii.*      *Damages*

Finally, Carus argues that it is entitled to summary judgment because SES is unable to sufficiently prove damages. Under Illinois law, "[d]amages are an essential element of a breach of contract action and a claimant's failure to prove damages entitles the defendant to judgment as a matter of law." *In re Ill. Bell Tel. Link-Up II*, 994 N.E.2d 553, 558 (Ill. App. Ct. 2013). Moreover, "[i]f a party establishes it is entitled to damages, but it is unable to prove those damages with a reasonable degree of certainty, it may only recover nominal damages awarded at the discretion of the trial judge." *Euroholdings Cap. & Inv. Corp. v. Harris Tr. & Sav. Bank*, 602 F. Supp. 2d 928, 936 (N.D. Ill. 2009).

To begin, Carus asserts that because the Licensed Products involve a new, unproven technology, SES is precluded from recovery by Illinois's "new business rule." "The general rule under Illinois law is that a new business has no right to recover lost profits." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 634 (7th Cir. 2007). Accordingly, Illinois's new business rule provides that "a new business, or an existing business with a new product, cannot recover lost profits because the future profits of a new business cannot be ascertained with any degree of certainty." *Kinesoft*, 139 F. Supp. 2d at 908; *see also TAS*, 491 F.3d at 634 ("We have recognized that Illinois' new business rule can apply when an entity, while established in the field, markets a new product."). "The reasoning behind the rule is simply that a new business has not demonstrated yet what its profits will be." *TAS*, 491 F.3d at 634; *see also Pavarti Corp. v. City of Oak Forest*, 709 F.3d 678, 685 (7th Cir. 2013) ("The [new business] rule is based on the correct observation that it is more difficult to establish loss objectively when a business is strangled in its

31

cradle, for then there is no history of profit and loss from which to extrapolate lost future profit . . . .").

At the same time, the new business rule does not establish an "inviolate rule that a new business can *never* recover lost profits." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 407 (Ill. 2006). Rather, the rule "may be overcome by sufficient evidence." *Second Amendment Arms v. City of Chicago*, No. 10-cv-4257, 2020 WL 1157347, at *12 (N.D. Ill. Mar. 10, 2020). "New businesses have successfully established lost profits by using historical data from similar franchise operations in similar locations; by using profits made by previous owners in the same business; and by establishing a profit history based on competitors' sales of the same product." *Id.*

In response to Carus's invocation of the new business rule, SES first asserts that the rule is outdated and has largely been rejected. While the Seventh Circuit has been critical of the rule, claiming that it "doesn't work because it manages to be at once vague and arbitrary," *see MindGames, Inc. v. Western Publishing Co.*, 218 F.3d 652, 657 (7th Cir. 2000), and has been "discredited," *Pavarti*, 709 F.3d at 685, its criticisms have been made in cases either applying another state's law or where the rule did not apply. *See Pavarti*, 709 F.3d at 685 ("[T]his is not a new-business case."); *Mindgames*, 218 F.3d 652 (applying Arkansas law). Nonetheless, since Illinois has not abandoned the new business rule, the Seventh Circuit has continued to apply it in cases governed by Illinois law. *See TAS*, 491 F.3d at 634. Thus, no matter the wisdom of the new business rule, because the License Agreement is governed by Illinois law, the Court is not free to disregard it. *E.g.*, *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) (stating that it is the duty of a federal court sitting in diversity to ascertain "what the state law is and apply it rather than to

prescribe a different rule, however superior it may appear from the viewpoint of 'general law' . . . .").

Next, SES contends that the new business rule does apply because it is seeking lost royalties as damages rather than lost profits.[12] Courts applying the new business rule routinely speak specifically of lost profits. At least one court applying Illinois law has questioned the applicability of the new business rule to a claim for lost royalties where, as here, the calculation of those royalties was not dependent on profits. *Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*, 511 F. Supp. 2d 324, 331 (E.D.N.Y. 2007); *see also Mindgames*, 218 F.3d at 657 ("[A]re royalties what the rule means by 'profits'? . . . An author who signs a contract with a publisher for the publication of his book would not ordinarily be regarded as being engaged in a 'business,' or his royalties or advance described as 'profits.'"). But other courts have noted that lost royalties are treated "in the same manner as lost profits in damages claims." *W. Publ'g Co. v. MindGames, Inc.*, 944 F. Supp. 754, 761 (E.D. Wis. 1996), *aff'd*, 218 F.3d 652 (7th Cir. 2000) (collecting cases). Moreover, here, SES's lost royalties are directly linked with lost sales, and "[c]ourts . . . have analyzed lost profits and lost sales using the same legal framework." *Clutch Auto Ltd. v. Navistar, Inc.*, No. 12 C 9564, 2015 WL 1299281, at *5 n.2 (N.D. Ill. Mar. 19, 2015). Thus, the Court finds that SES cannot escape the applicability of the new business rule based on the fact that it seeks to recover lost royalties rather than lost profits.

---

[12] Based on SES's characterization of its damages as "lost royalties," Carus claims that partial summary judgment should be entered in its favor capping SES's recoverable damages at the same $47,683 in unpaid royalties sought in the separate breach of contract claim discussed above. This argument is specious, as it conflates two different breach of contract claims. SES's claim stemming from Carus's failure to pay the full amount of royalties owed on its sales of the SR Products seeks royalties for Licensed Products ***already sold*** whereas the present claim seeks damages corresponding to the royalties for sales that ***could have*** been made had Carus used commercially reasonable efforts to market the Licensed Products.

However, there is a recognized exception to the new business rule where there is an established market for a technically "new" product. *Kinesoft*, 139 F. Supp. 2d at 910; *Milex Prods., Inc. v. Alra Lab'ys, Inc.*, 603 N.E.2d 1226, 1237 (Ill. App. Ct. 1992). For purposes of this exception, the relevant issue is not how the new and existing products "differ in the manner in which they carry out their functions, but rather whether they perform different functions. In other words, the question is not whether the products are ***identical***, but whether they are ***functionally identical***." *TAS Distrib. Co. v. Cummins, Inc.*, No. 07-CV-1141, 2011 WL 5180285, at *9 (C.D. Ill. Oct. 28, 2011); *see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, No. 01 C 4366, 2003 WL 21506808, at *4 (N.D. Ill. June 27, 2003) ("While there may have been differences between the analog service WH-TV had previously offered and the digital service it subsequently offered, different is not necessarily new." (internal quotation marks omitted)). If the "new" Licensed Products are functionally identical to other products sold in the market, then there is a "non-speculative basis for estimating sales of [SES's] product (namely, [products] that were the functional equivalent of [SES's product])." *TAS*, 2011 WL 5180285, at *9. SES notes that Carus had a healthy and well-established business selling permanganate products for remediation long before it had any business relationship with SES. (DRPSAF ¶ 33.) And RemOx SR uses the same potassium permanganate as products Carus has sold for the same function. (*Id.* ¶ 34.) Similarly, Carus's competitors have sold persulfate products for remediation purposes. (*Id.* ¶ 35.) SES contends that the Licensed Products built off those earlier technologies and performed the same function, just more efficiently. (DRPSF ¶ 7; DRPSAF ¶¶ 33–37.) Carus disputes SES's contentions and further argues that, because SES's technology does not even work, it cannot be deemed functionally identical to other remediation products. But all Carus does is demonstrate that there is an issue of fact that must be submitted to the jury. Certainly, if the Licensed Products

34

were ineffective and not an adequate substitute for the remediation products Carus had already been selling that would preclude SES from establishing its damages. For now, SES has sufficiently shown evidence that could allow a finder of fact to conclude that the Licensed Products did work and were functionally identical to other products sold in the market. (*See* DRPSAF ¶¶ 30–31, 33–37.)

If the new business rule is found not to apply, SES still has to prove its damages to a reasonable certainty. *TAS*, 491 F.3d at 635 ("Illinois law, even without reference to the new business rule, clearly requires that damages be proved to a reasonable certainty."). Reasonable certainty does not mean that "[t]he amount of lost profits . . . be established with absolute certainty; mathematical precision is not possible in calculating prospective profits." *Oakleaf of Ill. v. Oakleaf & Assocs., Inc.*, 527 N.E.2d 926, 933 (Ill. App. Ct. 1988). "Rather, the evidence need only afford a reasonable basis for the computation of damages which, with a reasonable degree of certainty, can be traced to defendant's wrongful conduct." *TAS*, 491 F.3d at 633. The Illinois Supreme Court has cautioned that "[d]efendants should not be permitted to escape liability entirely because the amount of the damage they have caused is uncertain. To do so would be to immunize defendants from the consequences of their wrongful conduct." *Belleville Toyota, Inc. v. Toyota Motor Sales, USA, Inc.*, 770 N.E.2d 177, 199 (Ill. 2002). Nonetheless, "Illinois courts have not hesitated to reverse damage awards based on false assumptions or data as speculative." *TAS*, 491 F.3d at 635 (internal quotation marks omitted).

Carus argues that SES does not have sufficient evidence to allow the jury to calculate its damages with a reasonable degree of certainty. To compute its alleged damages, SES relies on three documents produced by Carus that contain Carus's own projections for sales of the Licensed Products. First, in January 2010, Carus projected that it would sell between $10-$20 million of the

35

Licensed Products annually. (DRPSAF ¶ 39.) That projection was derived as part of Carus's stage gate process, its process for evaluating which projects it would continue and which it would stop. (*Id.* ¶ 41.) In February 2013, Carus made a similar projection of $16-$18 million in sales during another stage gate process. (*Id.* ¶ 39.) Finally, a detailed market plan for just RemOx SR+ prepared in December 2014 projected sales of $10-$18 million for only that product. (*Id.* ¶¶ 39–40.) That market plan had been prepared by a Carus employee with extensive marketing experience at the company. (*Id.* ¶ 40.) It was also reviewed by several other Carus employees, including Dingens and the technical lead for the SR Products. (*Id.*) In the market plan, Carus estimated that there was a $75 million market for remediation products like the Licensed Products. (*Id.* ¶¶ 38, 41.) Moreover, Carus had previously estimated that it had a 90–95% share of that market. (*Id.* ¶ 41.) SES's expert, John Bone, relied on these projections and other Carus internal documents to produce estimates of SES's lost royalties from Carus's failure to use commercially reasonable efforts to market the Licensed Products.[13] He then computed two lost royalties projection scenarios,[14] applying to each a discount rate that accounted for the risk that Carus would not achieve its projected sales

In response, Carus does not deny that it made these projections but refers to the testimony of one of its employees to deride its projections as nothing more than a "[s]cientific wild-ass

---

[13] SES also produced evidence of its own estimate of the sales Carus should have made of the Licensed Products. (DRPSAF ¶ 42.) According to SES, its estimates were made before it obtained Carus's projections in discovery and yet were consistent with those projections. However, Carus accurately points out that SES set forth its estimate in a written settlement proposal and therefore requests that the Court strike the evidence pursuant to Federal Rule of Evidence 408, which prohibits the use of a "statement made during compromise negotiations about the claim" to prove the amount of a disputed claim. The Court agrees that this statement made during settlement negotiations cannot be used as evidence of the amount of SES's damages. *See* Fed. R. Civ. P. 408 advisory committee's note to 2006 amendment ("The amendment makes clear that Rule 408 excludes compromise evidence even when a party seeks to admit its own settlement offer or statements made in settlement negotiations.").

[14] Bone computed two other lost royalties scenarios that were previously excluded by the Court in its ruling granting in part and denying in part Carus's motion to strike SES's experts. (Dkt. Nos. 238–39.)

guess." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 8, Dkt. No. 243; PRDSF ¶ 52.) Thus, Carus contends that SES has not satisfied its burden of demonstrating that Carus's projections were anything more than the kind of unreliable speculation that Illinois courts routinely reject as a basis for computing damages. *See TAS*, 491 F.3d at 633 ("Illinois courts consistently have rejected the use of speculative, inaccurate or false projections of income in the valuation of a business . . . ." (internal quotation marks omitted)). But the Court finds that the "scientific wild-ass guess" testimony is not probative, as the employee was not referring to any of the three Carus projections relied upon by SES. (*See* DRPSAF ¶ 43.) Nothing in the record suggests that those projections were based on a guess. And viewing the evidence in the light most favorable to SES, the non-moving party on this claim, it is certainly not reasonable to infer that a well-established and successful company like Carus routinely relied on guesswork in making the sales projections that informed its business decisions. *See WrestleReunion, LLC v. Live Nation Television Holdings, Inc.*, No. 8:07-cv-2093-JDW-MAP, 2009 WL 2473686, at *11 (M.D. Fla. Aug. 11, 2009) ("Defendant's pre-dispute projections were no mere 'interested guess' prepared with an eye on litigation. Instead, they were the product of deliberation by experienced businessmen charting their future course." (internal quotation marks omitted)).

Nonetheless, the Seventh Circuit has observed that many internal projections "represent hopes rather than the results of scientific analysis." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005). Of course, here, SES relies not on its own sales projections but Carus's projections, the alleged wrongdoer. Several courts have found that "[i]n estimating damages, a claimant may rely on reports and projections made by the wrongdoer itself." *Sir Speedy, Inc. L&P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) (applying Connecticut law); *see also WrestleReunion*, 2009 WL 2473686, at *11 (finding that a statement created by the

defendant to determine whether or not a project would be profitable provided "a standard from which the loss of revenue can be determined with reasonable certainty"); *Pharmacy, Inc.*, 511 F. Supp. 2d at 334 (noting, in a case governed by Illinois law, that "[a] plaintiff may use the defendant's prelitigation projections of sales or profits in establishing damages of lost sales or profits"). Especially in light of its knowledge of and experience in the remediation business, evidence of Carus's projections can be deemed to have at least some reliability when viewed in the light most favorable to SES. *Cf. Cates v. Morgan Portable Bldg. Corp.*, 591 F.2d 17, 22 (7th Cir. 1979) (finding that an estimate of lost profits made by an interested party "was entitled to some consideration by the district court because of [the party's] prior knowledge of and experience in the [relevant] business"). While Carus is certainly free to argue to a jury that its own projections were not reliable, the Court cannot find as a matter of law that SES failed to meet its burden of presenting evidence that provides a reasonable basis for calculating its lost royalties.

In sum, the Court finds that Carus's promise to use commercially reasonable efforts to market the Licensed Products is enforceable. Further, SES has shown that there are jury questions as to the commercial reasonableness of Carus's efforts and the existence and amount of SES's damages. Consequently, Carus's motion for summary judgment is denied as to the breach of contract claim based on Carus's alleged failure to use commercially reasonable efforts to market the Licensed Products.

### C.     Breach of Fiduciary Duty

In Count II of its First Amended Complaint, SES alleges that Carus breached the fiduciary duty it owed to SES by virtue of the License Agreement. Carus argues that summary judgment should be entered in its favor because no fiduciary relationship existed between Carus and SES.

"Under Illinois law, a contractual relationship normally does not create a fiduciary relationship between the contracting parties." *Glovaroma, Inc. v. Maljack Prods., Inc.*, No. 96 C 3985, 1998 WL 102742, at *5 (N.D. Ill. Feb. 26, 1998); *see also Benson v. Stafford*, 941 N.E.2d 386, 397 (Ill. App. Ct. 2010) ("The mere fact that the parties have engaged in business transactions or have a contractual relationship is not itself sufficient to establish a fiduciary relationship."). However, in the business context, the particular circumstances of the parties' relationship may give rise to a fiduciary relationship. *Yokel v. Hite*, 809 N.E.2d 721, 725 (Ill. App. Ct. 2004). In particular, "a contractual relationship may elevate to the status of a fiduciary relationship where one party reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first." *Glovaroma*, 1998 WL 102742, at *5 (internal quotation marks omitted). "Courts use two factors to determine whether a fiduciary relationship exists in the business context: (1) the degree of business experience between the parties and (2) the extent to which the allegedly subservient party entrusts the handling of his business and financial affairs to the other party." *Id.* The party asserting the fiduciary relationship has the burden of proving the existence of a fiduciary duty by clear and convincing evidence. *Burdett v. Miller*, 957 F.2d 1375, 1382 (7th Cir. 1992).

"Generally, where parties capable of handling their business affairs deal with each other at arm's length, and there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged servient party, no fiduciary relationship will be deemed to exist." *State Sec. Ins. Co. v. Frank B. Hall & Co.*, 630 N.E.2d 940, 947 (Ill. App. Ct. 1994). Here, the undisputed facts demonstrate that SES and Carus dealt with each other at arm's length in negotiating the License Agreement. First, SES was represented by counsel throughout the negotiation, drafting, and execution of the License Agreement. (PRDSF ¶ 20); *see Noah v. Enesco Corp.*, 911 F. Supp.

299, 303 (N.D. Ill. 1995) (citing the fact that the plaintiff was represented by counsel during his negotiations with the defendant as a factor weighing against finding a fiduciary relationship); *Benson*, 941 N.E.2d at 941 (observing that the fact that the plaintiffs retained legal counsel to advise them in their dealings with the defendant suggested that the plaintiffs did not trust the defendant). Negotiations took place over a period of months and involved a genuine bargaining process, as SES several times rejected certain terms proposed by Carus. (DRPSF ¶¶ 21, 23–24; PRDSF ¶¶ 21–22); *see Glovaroma*, 1998 WL 102742, at *5 (noting that the parties' "give and take" transaction was indicative of the plaintiff's business experience and the defendant's lack of "overwhelming business influence" over the plaintiff in the relationship).

Furthermore, the Swearingens, SES's principals, were hardly unsophisticated businesspeople. They both had undergraduate degrees, and Lindsay Swearingen obtained a doctorate while Jason Swearingen did some post-graduate coursework. (PRDSF ¶¶ 8–9.) Together, the Swearingens founded SES in 2003 and by the time they contacted Carus about commercializing SES's technology, their company employed 6 people. (*Id.* ¶¶ 6, 34.) And before executing the License Agreement, Lindsay Swearingen read the contract fully and believed that she understood the terms of the agreement. (*Id.* ¶ 33.) Undoubtedly, Carus was a well-established participant in the remediation market with far greater revenues and resources than SES. And unlike Carus, SES had never developed or commercialized any product before entering the License Agreement. (DRPSAF ¶ 44.) But Carus's dominant business position does not, by itself, transform the parties' contractual relationship into a fiduciary relationship. *Noah*, 911 F. Supp. at 303 ("While the Court readily acknowledges that [the defendant], as the country's largest giftware manufacturer, held a dominant position in the relationship, [the plaintiff] has failed to present sufficient evidence to convince this Court that this dominance transformed the 'formal,

contractual relationship into a confidential or fiduciary relationship.'" (quoting *Carey Elec. Contracting, Inc. v. First Nat'l Bank of Elgin*, 392 N.E.2d 759, 763 (Ill. App. Ct. 1979))).

Finally, SES did not sufficiently entrust its business affairs to Carus so as to give rise to a fiduciary relationship. Here, SES's breach of fiduciary duty claim is predicated solely on Carus's failure to fulfill its obligations under the License Agreement by, for example, making insufficient efforts at commercializing the Licensed Products. (*See* First Am. Compl. ¶ 105, Dkt. No. 207.) But "[w]here one party to a business contract trusts the other to do no more than fulfill its obligations under the contract, no fiduciary duty arises." *Yokel*, 809 N.E.2d at 707. Rather, SES must demonstrate that it placed more trust in Carus than typical of a normal business relationship, as "[w]e trust most people with whom we choose to do business." *Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992). Without evidence of special circumstances not typical of a normal business relationship, the fact that Carus (temporarily) held an exclusive license to SES's technology did not elevate it to the status of SES's fiduciary. *See, e.g.*, *Sony Music Ent. Inc. v. Robison*, No. 01 CIV. 6415(LMM), 2002 WL 272406, at *3 (S.D.N.Y. Feb. 26, 2002) ("While it is not entirely clear when fiduciary duties arise out of a contractual relationship, additional factors are necessary to convert a conventional business relationship into a fiduciary relationship. . . . The fact that Sony is responsible for collecting royalties and passing them on to Defendants does not create a fiduciary relationship."); *Mellencamp v. Riva Music Ltd.*, 698 F. Supp. 1154, 1159 (S.D.N.Y. 1988) ("Ordinarily . . . the express and implied obligations assumed by a publisher in an exclusive licensing contract are not, as a matter of law, fiduciary duties.").

Taken together, the undisputed evidence allows the Court to rule as a matter of law that neither the License Agreement nor the circumstances surrounding the parties' execution of that

agreement gave rise to a fiduciary relationship between Carus and SES. The Court therefore grants Carus summary judgment on SES's claim for breach of fiduciary duty.

### D.    Common Law Fraud

Both parties move for summary judgment on SES's common law fraud claim. In evaluating cross-motions for summary judgment, the Court must take "the facts in the light most favorable to the non-movant, first for one side and then for the other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003).

The elements of an Illinois common law fraud claim are: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Hart v. Boehmer Chevrolet Sales, Inc.*, 787 N.E.2d 350, 356–57 (Ill. App. Ct. 2003). "In the context of common law fraud, the law presumes that transactions are fair and honest; fraud is not presumed. Accordingly, fraud must be proved by clear and convincing evidence." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 856 (Ill. 2005). The Court will address the parties' evidence as to each element of common law fraud to determine whether either Carus or SES has demonstrated the absence of a genuine issue of material fact entitling it to summary judgment.

#### i.    *False Statement of Material Fact*

SES's common law fraud claim is based on two false statements made prior to the execution of the License Agreement by Dingens, in his capacity as Carus's Global Marketing Manager for the company's Carus Remediation Technologies division. To establish a false statement of material fact, a plaintiff must prove that: (1) the defendant made a misrepresentation;

(2) it must involve a fact; and (3) the misrepresentation must be material. *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 7 (Ill. App. Ct. 2001).

First, during a January 9, 2009 meeting, Dingens told the Swearingens that Carus had international sales staff located in Brazil, China, Singapore, Belgium, and Canada. (DRPSF ¶ 25; PRDSF ¶¶ 15, 36, DRPSAF ¶ 53.) Dingens repeated that representation at another meeting with the Swearingens on May 26, 2009, and on a telephone call with Lindsay Swearingen on June 16, 2009. (DRPSF ¶ 25; PRDSF ¶ 17; DRPSAF ¶ 53.) In reality, Carus did not have any payroll employees located in Brazil, China, Singapore, Belgium, or Canada. (DRPSF ¶ 65; DRPSAF ¶ 55.) Instead, Carus had one employee based in Italy who was responsible for remediation product sales in all of Europe and an employee sales manager based in the United States responsible for sales in Canada and Mexico. (DRPSF ¶ 65; PRDSF ¶ 16; DRPSAF ¶ 55.) In addition, Carus had distributors that were capable of selling Carus products in Brazil, China, Singapore, Belgium, and Canada. (*Id.*)

Undoubtedly, this statement constituted a representation of fact. However, Carus insists that there is a question of fact as to whether Dingens made a false statement. It asserts that the claimed falsity was created by the Swearingens's misinterpretation of "sales staff" as meaning Carus-employed salespeople rather than independent-contractor distributors. However, the fact that the phrase "sales staff" could be open to multiple interpretations does not preclude a fraud claim. *BP Amoco Chem. Co. v. Flint Hills Res., LLC*, 600 F. Supp. 2d 976, 992 (N.D. Ill. 2009) ("[T]he law is clear that an ambiguous statement can serve as the basis for a fraud claim."). Certainly, Dingens could have expected the Swearingens to reasonably understand "sales staff" to refer to Carus employees dedicated to selling Carus products. *See* Restatement (Second) of Torts § 527 (1977) ("A representation that the maker knows to be capable of two interpretations, one of

which he knows to be false and the other true is fraudulent if it is made: (a) with the intention that it be understood in the sense in which it is false, or (b) without any belief or expectation as to how it will be understood, or (c) with reckless indifference as to how it will be understood.").

Further, Carus contends that Dingens's representation was not false because Carus had the capability of distributing products in the countries cited by Dingens. But Carus's ability to distribute its products internationally via a third-party distributor (who also sells numerous other companies' products) is different from having salespeople dedicated to marketing Carus's products to customers in international markets. Given the new technology at issue, Carus's ability to distribute the Licensed Products in a particular international market would confer little value to SES absent a sales staff that could reach out to potential customers in that market and persuade them to buy the Licensed Products. By conflating distributors with sales staff, Dingens made a misrepresentation of fact.

Of course, to be actionable, any misrepresentation of fact must also be material. "[A] misrepresentation is 'material' if the plaintiff would have acted differently had he been aware of it, or if it concerned the type of information upon which he would be expected to rely when making his decision to act." *Miller*, 762 N.E.2d at 7; *see also Dyson, Inc. v. Syncreon Tech. (Am.), Inc.*, No. 17 C 6285, 2019 WL 3037075, at *4 (N.D. Ill. July 11, 2019) ("Facts are considered material if they would likely influence the principal's beliefs regarding the desirability of the transaction."). Certainly, there is enough evidence here for a jury to find that Dingens's misrepresentation was material. The whole purpose of SES entering into the License Agreement was to find a partner to help SES "commercialize its technology to the vast and broad potential markets for the technology." (DRPSF ¶ 9.) Thus, Carus's ability to reach international markets could be found pertinent to SES's decisionmaking. *See SMS Assist LLC v. E. Coast Lot &*

*Pavement Maint. Corp.*, 913 F. Supp. 2d 612, 628 (N.D. Ill. 2012) ("[The plaintiff] alleges that it specifically sought out a provider with a national presence who had experience servicing customers across regions of the United States. At the summary judgment stage, this court must assume that Defendants' alleged claims of national experience could have influenced [the plaintiff] to rely on them.").

Yet, by moving for summary judgment in its favor, SES asks this Court to rule as a matter of law that Dingens's misrepresentation was material. Generally, "the materiality of a misrepresentation for purposes of fraud is a question of fact, which must be determined by a trier of fact." *Thompson v. IFA, Inc.*, 536 N.E.2d 969, 973 (Ill. App. Ct. 1989). And to rule for SES, the Court would have to find materiality by clear and convincing evidence. It cannot go that far. There is no evidence in the record that SES was particularly interested in targeting the countries identified by Dingens or international markets more generally. Nor is there evidence concerning the size of the remediation markets in the countries identified by Dingens such that the Court could conclude that the presence of dedicated Carus sales staff would be a material factor in SES's decisionmaking. Finally, there are no provisions in the License Agreement requiring Carus to direct its commercialization efforts at any specific geographic location. (PRDSF ¶ 31.) In short, while there is evidence allowing a jury to find by clear and convincing evidence that Dingens's misrepresentation was material, the Court concludes that the evidence is not so strong for it to rule for SES on the materiality element as a matter of law.

The next representation at issue concerns Dingens's assertion that Carus had a successful track record with agreements to commercialize third-party technologies, which he made during the May 26, 2009 meeting with the Swearingens and again during the June 16, 2009 phone call with Lindsay Swearingen. (DRPSF ¶ 27; DRPSAF ¶ 56.) Specifically, he claimed that Carus had

acquired technology from a company called DBI in early 2008 and had since sold over $1 million of a remediation product incorporating that technology called CAP18. (DRPSF ¶¶ 27, 66; DRPSAF ¶¶ 56–57.) Yet, the evidence reveals that in all of 2009, Carus had sold only $103,082 of CAP18. (DRPSF ¶ 66; DRPSAF ¶ 57.) The previous year, Carus's total sales of DBI products (which included other products besides CAP18) was $254,483. (*Id.*) Thus, Carus could have sold, at most, $357,565 of CAP18 at the time of Dingens's representations. (*Id.*)

Based on the undisputed evidence, Dingens's representation about CAP18 sales is a misrepresentation of fact. While Carus contends that it achieved about $1 million of CAP18 sales by 2009 that contention is not supported by the record. Rather, Carus cites its sales of all DBI products dating back to 2003 to reach the $1 million figure even as it admits that it did not acquire the technology underlying CAP18 until 2008. Nonetheless, the Court again is unable to conclude as a matter of law that there is clear and convincing evidence that Dingens's misrepresentation of CAP18 sales was material. Indeed, the context around the misrepresentation is somewhat unclear. SES states that Dingens referred to Carus's "successful ***track record*** with ***agreements*** to commercialize a third party's technology." (DRPSF ¶ 27 (emphasis added).) Viewed in the light most favorable to Carus, Dingens's reference to "agreements," plural, and "track record" certainly suggests that CAP18 was cited as just one example. The question is whether Dingens also referred to other such agreements as well. In such case, the inaccuracy as to his claims about CAP18 may be deemed less material. Further, SES comes forward with no evidence as to how comparable CAP18's technology was to SES's technology. That information could affect how much SES's perception of Carus's success with CAP18 influenced its negotiating position.

Consequently, the record does not contain sufficient evidence for the Court to conclude as a matter of law that SES would have acted differently had it known the truth of CAP18's sales.

That does not mean that SES has not presented sufficient evidence from which a jury could find clear and convincing evidence of the materiality of Dingens's misrepresentation of CAP18's sales. Rather, as with Dingens's other misrepresentation, the Court finds only that the question must go to a jury. And because there is an issue of fact as to the materiality of Dingens's misrepresentations, SES is not entitled to summary judgment on the common law fraud claim.

ii.    Intent

To prove that Dingens's two misrepresentations constituted fraud, SES must show that he knew that the statements were false when he made them. "A party can satisfy the fraudulent intent element by proving that a misrepresentation was made knowingly or with a reckless disregard for its truth or falsity." *Orix Credit All., Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 479 (7th Cir. 1997); *see also Duhl v. Nash Realty Inc.*, 429 NE.2d 1267, 1274 (Ill. App. Ct. 1981) ("[S]tatements made in culpable ignorance of their truth or falsity are fraudulent."). Given Dingens's position as a Global Marketing Manager there is little question that he knew or should have known the details of Carus's sales staff, including the geographic locations of that staff. Similarly, he was also in the position to know sales figures for Carus products like CAP18. At minimum, there is enough evidence to support the conclusion that Dingens made the misrepresentations recklessly. Carus does not raise any arguments on this element.

In addition, a defendant's misrepresentations must be shown to have been made with an intent to induce the plaintiff to act. "Because a party will often have no direct evidence of fraudulent intent, circumstantial evidence may give rise to an inference of it." *Firstar Bank, N.A. v. Faul Chevrolet, Inc.*, 249 F. Supp. 2d 1029, 1044 (N.D. Ill. 2003). Here, Dingens made both misrepresentations on multiple occasions while trying to persuade SES to enter into the License Agreement with Carus. It is reasonable to infer that Dingens made the misrepresentations

intending to convince SES to enter into a business relationship with Carus on terms as favorable to Carus as possible. Since the Court has already denied SES's motion for summary judgment on the fraud claim and Carus does not argue intent in its motion for summary judgment, it suffices to say that the evidence demonstrates a genuine issue for trial with respect the issue of Carus's intent. *See, e.g.*, *Cincinnati Ins. Co. v. Guccione*, 719 N.E.2d 787, 792 (Ill. App. Ct. 1999) ("[S]ummary judgment is particularly inappropriate where . . . the motive, intent, or subjective feelings of the parties are at issue.").

iii.    Reliance

"As part of its fraud claim, a plaintiff must show that its reliance on the misrepresentation was justified. In other words, the reliance must be reasonable." *Siegel Dev., LLC v. Peak Constr. LLC*, 993 N.E.2d 1041, 1060 (Ill. App. Ct. 2013) (citation omitted). To determine whether a plaintiff's reliance was justified, a court should consider "all of the facts which the plaintiff knew, as well as those facts the plaintiff could have learned through the exercise of ordinary prudence." *Id.* (internal quotation marks omitted). Normally, the issue of reliance is a question of fact. *Id.*

As an initial matter, Carus asserts that the License Agreement contains a provision disclaiming reliance on oral misrepresentations that occurred before the parties' execution of the agreement. "[P]arties to contracts who . . . want to head off the possibility of a fraud suit will sometimes insert a 'no-reliance' clause into their contract, stating that neither party has relied on any representations made by the other." *Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644 (7th Cir. 2002); *see also Deluxe Media Servs., LLC v. Direct Disc Network, Inc.*, No. 06 C 1666, 2007 WL 707544, at *6 (N.D. Ill. Mar. 2, 2007) ("A no-reliance clause is one that states that the parties explicitly have not relied on any earlier or outside representations other than the ones in the contract."). Courts applying Illinois law have found that the existence of a no-

reliance clause in a contract precludes fraud claims "because [such clauses] inherently disprove reasonableness." *Triumph Packaging Grp. v. Ward*, 877 F. Supp. 2d 629, 647 (N.D. Ill. 2012).

According to Carus, the following provision of the License Agreement constitutes a no-reliance clause:

> This Agreement constitutes the sole and entire agreement between SES and Carus with respect to the subject matter hereof, and it shall supersede any and all prior agreements and understandings with respect to such subject matter. No modification or renewal of this Agreement shall be binding upon either party unless it is made in writing and signed by an authorized representative of each party.

(PRDSF ¶ 24.) However, this provision is easily recognizable as an integration clause. *See Triumph Packaging*, 877 F. Supp. 2d at 647 (identifying similar language in a contract as an integration clause). By contrast, in *Rissman v. Rissman*, the Seventh Circuit decision first holding that "a written anti-reliance clause precludes any claim of deceit by prior representations," the no-reliance clause provided: "The parties further declare that they have not relied upon any representation of any party hereby released or of their attorneys, agents, or other representatives concerning the nature or extent of their respective injuries or damages." 213 F.3d 381, 383–84 (7th Cir. 2000) (alterations omitted); *see also Triumph Packaging*, 877 F. Supp 2d at 647 ("This Circuit has acknowledged that, under Illinois law, for a clause to be considered a no-reliance clause, and not an integration clause, it must explicitly disavow any 'reliance.'").

As the Seventh Circuit has explained, an integration clause, by virtue of the parol evidence rule, "prevents a party to a contract from basing a claim of breach of contract on agreements or understandings, whether oral or written, that the parties had reached during the negotiations that eventuated in the signing of a contract but that they had not written into the contract itself." *Vigortone*, 316 F.3d at 644. Yet, "[t]he parol evidence rule is a rule of contract law, and a contract integration clause is a privately negotiated supplement to the rule." *Extra Equipamentos E*

49

*Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 723 (7th Cir. 2008). On the other hand, "fraud is a tort, and the parol evidence rule is not a doctrine of tort law." *Vigortone*, 316 F.3d at 644. Further, "all an integration clause does is limit the evidence available to the parties should a dispute arise over the meaning of the contract. It has nothing to do with whether the contract was induced, or its price jacked up, by fraud." *Id.* Consequently, the Seventh Circuit has "assumed (though the matter is not free from doubt) . . . that neither the [parol evidence] rule nor [an integration] clause prevents a disappointed party to the contract from basing a tort suit on proof that in the course of the negotiations the other party made fraudulent representations." *Extra Equipamentos*, 541 F.3d at 723. That means that parties often add a separate no-reliance clause, which "serve[s] a legitimate purpose in closing a loophole in contract law by heading off a suit for fraud used as a device for trying to get around the limitations" imposed by the parol evidence rule and integration clauses. *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 589 F.3d 881, 885 (7th Cir. 2009) (internal quotation marks omitted).

Carus emphasizes that, in reaching its conclusion in *Rissman*, the Seventh Circuit relied on two cases where the relevant contractual provisions' language resembled that of a typical integration clause. *Rissman*, 213 F.3d at 383–84 (citing *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411 (1st Cir. 1989); *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988)). The Court further notes that the Seventh Circuit later suggested that it was possible that an integration clause, by itself, might negate justifiable reliance. *See ADM All. Nutrition, Inc. v. SGA Pharm Lab, Inc.*, 877 F.3d 742, 750 (7th Cir. 2017) ("While an integration clause alone may or may not have barred [the plaintiff's claims], a nonreliance clause would." (citation omitted)); *see also Thomas v. Today's Growth Consultant, Inc.*, No. 15-CV-06015, 2018 WL 3496095, at *4 (N.D. Ill. July 20, 2018) (explaining that *Vigortone*'s holding was "not necessarily definitive" because

"Illinois courts had yet to address the issue"). Nonetheless, the Seventh Circuit has predicted that if the Illinois Supreme Court were to address the issue, it would line up with the "majority rule" that "an integration clause does not bar a fraud claim." *Vigortone*, 316 F.3d at 644. Because that remains the law of this Circuit, the Court finds that the License Agreement's integration clause does not defeat SES's fraud claim.

Next, Carus argues that the evidence shows that Dingens's misrepresentations were made well before the execution of the License Agreement and therefore SES cannot claim justifiable reliance because it that had ample opportunity to investigate the veracity of those statements. "Illinois courts have long recognized that a party is not justified in relying on representations made when he has ample opportunity to ascertain the truth of the representations before he acts." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 882 (7th Cir. 2005). Thus, "[a] person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another." *Pack v. Maslikiewicz*, 144 N.E.3d 37, 65 (Ill. App. Ct. 2019) (internal quotation marks omitted). However, the requisite ordinary prudence does not require a plaintiff to "assume that the [defendant] is a liar" or to "dig beneath apparently adequate assurances." *Consol. Bearings Co. v. Ehret-Krohn Corp.*, 913 F.2d 1224, 1229 (7th Cir. 1990). Because "[j]ustified reliance depends on all the circumstances and considers the information available to a plaintiff," in some instances "that means the plaintiff need not make any additional inquiry." *Linkepic Inc. v. Vyasil, LLC*, 370 F. Supp. 3d 906, 918 (N.D. Ill. 2019). In particular, Illinois courts recognize that

> where the representation is made as to a fact actually or presumptively within the speaker's knowledge, and contains nothing so improbable as to cause doubt of its truth, the hearer may rely upon it without investigation, even though the means of investigation were within the reach of the injured party and the parties occupied adversary positions toward one another.

*Pack*, 144 N.E.3d at 65 (internal quotation marks omitted).

There is no question that Carus (and Dingens) had superior knowledge about its own sales employees and its sales of products like CAP18. *See Luciani v. Bestor*, 436 N.E.2d 251, 256 (Ill. App. Ct. 1982) ("Only where the parties do not have equal knowledge, or access thereto . . . will a person be found to have justifiably relied upon the others' representations."); *MacAuley v. Rickel*, 238 N.E.2d 603, 606 (Ill. App. Ct. 1968) ("[P]laintiffs' reliance will be justified where . . . the defendant possessed a superior knowledge of the facts represented."). Nor were Dingens's representations so improbable that they should have raised a red flag. As a company with annual revenues of around $100 million (DRPSF ¶ 12), it is entirely believable that Carus would have salespeople located around the world. Indeed, Carus did have an international presence even if it did not match Dingens's representation to the Swearingens. (DRPSF ¶ 65; PRDSF ¶ 16.) Similarly, nothing in the record suggests that it would be unusual for Carus to achieve $1 million of sales in a year of CAP18 such that SES should have conducted its own investigation. The Court therefore cannot rule as a matter of law that it was unreasonable for SES to rely upon Dingens's misrepresentations without further investigation.[15]

Finally, Carus claims that SES waived its ability to claim fraud because it learned of the falsity of Dingens's representations shortly after entering into the License Agreement but did not avail itself of its right to terminate the agreement for cause. In certain circumstances, a plaintiff can waive its fraud claim by affirming the contract. *See Havoco of Am. v. Hilco, Inc.*, 731 F.2d 1282, 1286–87 (7th Cir. 1984). However, the facts regarding when SES discovered Carus's misrepresentation are disputed. (PRDSF ¶¶ 35–36.) And while the License Agreement did allow

---

[15] The Court also notes that even if it ruled as a matter of law that Dingens' misrepresentations were material, it would nonetheless deny SES's motion for summary judgment because there is an issue of fact as to whether SES reasonably relied on those misrepresentations. *See Pack*, 144 N.E.3d at 65 ("Generally, the question of whether a plaintiff's reliance was reasonable is a question of fact; however, where only one conclusion can be drawn from the undisputed facts, the question becomes one for the court to determine.").

for any party to terminate the agreement within the first three years for cause, it specifies the events constituting "cause." (First Am. Compl., Ex. A, License Agreement § 10.1, Dkt. No. 207-1.) A misrepresentation predating the agreement's execution is not one of the listed causes. Ultimately, waiver "is determined by a party's conduct and turns on the facts of the case." *Transco Lines, Inc. v. CarrierDirect, LLC*, No. 19 CV 4307, 2020 WL 1503576, at *3 (N.D. Ill. Mar. 30, 2020). Accordingly, "under Illinois law, questions of waiver are inappropriate for summary judgment." *Collegiate Poster Network, Inc. v. Signet Bank/Va.*, No. 92 C 2205, 1993 WL 112564, at *7 (N.D. Ill. Apr. 9, 1993). Here, the facts do not unequivocally establish waiver and Carus is therefore not entitled to summary judgment on that basis.

*iv.*      *Damages*

Carus does not contend that SES failed to satisfy the damages element of the fraud claim. The Court agrees that SES produced sufficient evidence to meet its burden of showing damages. Specifically, SES states that Carus was willing to pay $200,000 upon execution of the License Agreement but as negotiations progressed, SES was persuaded to accept a lesser upfront payment of $50,000. (DRPSF ¶ 32.) Had SES known the truth about Dingens's misrepresentations, it claims it would have insisted upon the $200,000 upfront payment.

In sum, while the Court cannot rule as a matter of law that SES clearly and convincingly proved that Dingens's misrepresentations constituted fraud, SES has come forward with sufficient evidence to show that the issue should be submitted to a jury. For that reason, both SES's and Carus's motions for summary judgment on the common law fraud claim are denied.

## E.      Promissory Fraud

Carus moves for summary judgment on SES's promissory fraud claim set forth in Count IV of the First Amended Complaint, which is based on Carus's promise to sell or attempt to sell

53

Licensed Products to Carus's existing customers. This promise was made by Dingens on three separate occasions during negotiations of the License Agreement. (DRPSAF ¶ 58.) According to SES, Carus had no intention of fulfilling the promise at the time it was made and, following the execution of the License Agreement, never made any bona fide attempts to market any Licensed Product to its customers.

A claim for promissory fraud involves "a false statement of intent regarding future conduct [and] is generally not actionable under Illinois law unless the plaintiff also proves that the act was part of a scheme to defraud." *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007). The scheme exception involves circumstances "where the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *Steinberg v. Chi. Med. Sch.*, 371 N.E.2d 634, 641 (Ill. 1977). "This exception is broad, and has even been viewed as swallowing the rule barring promissory fraud actions." *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992). Under the Seventh Circuit's interpretation, "a 'scheme to defraud' requires a pattern of fraudulent statements or one particularly egregious fraudulent statement." *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 136 (7th Cir. 2011) (citations omitted).

According to SES, Carus's false promise to market the Licensed Products to its existing customers was part of a pattern of fraudulent statements, including Dingens's two misrepresentations regarding Carus's international sales employees and success in commercializing licensed technologies. Because "[p]romissory fraud is a disfavored cause of action in Illinois . . . . the burden on a plaintiff claiming promissory fraud is deliberately high." *Bower*, 978 F.2d at 1012. A plaintiff must first show that, "***at the time the allegedly fraudulent statement was made***, it was an intentional misrepresentation." *Ass'n Benefit Servs.*, 493 F.3d at

54

853. "[T]his requirement means that, when the promise was made, the promisor had no intent to fulfill it; if the promisor simply changed his mind, an action for fraud will not lie." *Id.* To prove that a defendant made a promise without intending to keep it, a plaintiff "must be able to point to specific, objective manifestations of fraudulent intent." *Bower*, 978 F.2d at 1012 (internal quotation marks omitted).

As evidence that Carus had no intention of following through with its promise to sell or attempt to sell the Licensed Products to its customers, SES first points to a 2006 Carus market plan. In that market plan, Carus emphasized that to ensure the growth of its remediation business, it needed to continue to protect its United States market against new technologies and new competitors. (DRPSAF ¶ 7.) In that same document, Carus observed that one of the weaknesses in its remediation business was that the company had "[n]o new topics to present at conferences" thereby losing "buzz." (*Id.*) SES also cites evidence showing Carus was using SES's technology to look "innovative" and to have "something new to talk to customers about." (*Id.* ¶ 8.) And, one year after the execution of the License Agreement, Carus told SES that it was "not in the business of cannibalizing [its] primary product line." (*Id.* ¶ 1.)

The Court does not believe that SES has come forward with specific objective proof demonstrating that Carus's promise to market the Licensed Products to its customers was false when made. Rather, SES relies on inferences to bridge the gap between its evidence and its contention that Carus acquired SES's technology to tout itself to customers as an innovator while secretly sabotaging that technology to protect its existing business from competition. But SES cannot avoid summary judgment on its promissory fraud claim by relying solely on "circumstantial evidence and inference." *Bower*, 978 F.2d at 1012. Although it is possible that SES never intended to market the Licensed products, "speculation, possibilities, and reasonable

explanations for [Carus's] conduct do not satisfy [SES's] burden of showing fraud by clear and convincing evidence." *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 435 (7th Cir. 1996). Indeed, it is equally possible under SES's evidence that Carus wanted to look innovative by developing SES's new technology and protect or enhance its market position by being the exclusive seller of products incorporating that technology. *Cf. Naturalock Sols., LLC v. Baxter Healthcare Corp.*, No. 14-cv-10113, 2016 WL 5792377, at *6 (N.D. Ill. Oct. 4, 2016) (dismissing promissory fraud claim where the plaintiff failed to plead facts showing that the defendant's conduct "was motivated by fraud as opposed to commercial or other reasons"). SES is also not aided by Carus's later statement that it did not want to cannibalize its primary product line because it is not clear from the record what connection, if any, that statement had with Carus's performance under the License Agreement. Moreover, this statement was made over a year after Dingens last made the promise at issue. *See Ass'n Benefit Servs.*, 493 F.3d at 853 ("Illinois law does not allow the plaintiffs to proceed on a fraud claim when the evidence of intent to defraud consists of nothing more than unfulfilled promises and allegations made in hindsight.").

Viewing Carus's allegedly false promise in the context of the two alleged misrepresentations underlying SES's common law fraud claim does not change the analysis. At best, the misrepresentations are consistent with a scheme by Carus to overstate its commercialization capabilities to obtain better terms for itself in the License Agreement. But Carus's desire to acquire an exclusive license to SES's technology on the cheap does not necessarily lead to the conclusion that Carus lacked a sincere desire to actually sell any Licensed Products. *See Zic v. Italian Gov't Travel Off.*, 130 F. Supp. 2d 991, 995 (N.D. Ill. 2001) ("Objective proof of fraudulent intent is required because the mere failure to keep a promise could be caused by any number of motivations besides fraud.").

The Court concludes that no reasonable trier of fact could find that SES's evidence provided clear and convincing proof that Carus's promise to sell or attempt to sell the Licensed Products to its existing customers was false when made. Consequently, Carus's motion for summary judgment is granted as to the promissory fraud claim.

### F.  Constructive Fraud

The last claim in SES's First Amended Complaint is for constructive fraud. "Constructive fraud includes any act, statement or omission which amounts to positive fraud or which is construed as a fraud by the court because of its detrimental effect upon public interests and public or private confidence." *Joyce v. Morgan Stanley & Co.*, 538 F.3d 797, 800 (7th Cir. 2008). Such a claim "requires the existence of a confidential or fiduciary relationship." *Id.* The Court has already found that no fiduciary relationship existed between Carus and SES, and SES does not argue that there is some other relationship between the parties that can sustain its constructive fraud claim. SES's constructive fraud claim therefore fails and Carus is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, SES's motion to partially strike the opinions, expert report, and testimony of Carus's expert Michelle Crimi and to strike the opinions, expert report, and testimony of Carus's expert George Wheeler (Dkt. No. 250) is granted, its motion for partial summary judgment (Dkt. No. 244) is granted in part and denied in part, and Carus's motion for summary judgment on Counts I–V of the First Amended Complaint (Dkt. No. 242) is granted in part and denied in part. Summary judgment is granted in favor of Carus as to Counts II, IV, and V. Summary judgment is granted in favor of SES as to the breach of contract claim based on unpaid royalties set forth in Count I.

ENTERED:

Dated: October 14, 2021

Andrea R. Wood
United States District Judge